**Aaron CAMPBELL, Administrator of the Estate of Raymond Campbell, Deceased, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 89–2206.

United States Court of Appeals, Seventh Circuit.

Argued April 2, 1990.

Decided June 20, 1990.

Rick M. Schoenfield, Ettinger & Schoenfield, Chicago, Ill., for plaintiff-appellant.

Ann L. Wallace, Asst. U.S. Atty., Chicago, Ill., for defendant-appellee.

Before FLAUM and KANNE, Circuit Judges, and NOLAND, Senior District Judge.*

* The Honorable James E. Noland, Senior District Judge for the Southern District of Indiana, is sitting by designation.

NOLAND, Senior District Judge.

The plaintiff brought this medical malpractice suit against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), §§ 2671–2680. The plaintiff alleges that he was injured by the negligence of a surgeon employed by the defendant while undergoing an operation at the Veterans' Administration ("VA") hospital in Chicago. After a bench trial, the district court held that the plaintiff failed to meet his burden of showing that the surgeon's actions deviated from the relevant standard of care. The district court also found that the plaintiff failed to prove that the surgeon's acts or omissions proximately caused the plaintiff's injuries. The plaintiff appeals the district court's judgment in favor of the defendant, and we affirm.

## I. FACTUAL BACKGROUND

On November 7, 1984, Raymond Campbell was admitted to the VA hospital in Chicago for medical evaluation, diagnosis, and treatment relating to numerous transient ischemic attacks ("TIAs") that he had been suffering. In simplest terms, TIAs are warning signs of an impending stroke. At the VA hospital, Campbell underwent an operation known as a carotid endarterectomy ("CE"), which is performed to remove atherosclerotic debris from a stenotic (or narrowed) artery in the hope of preventing a stroke. The operation was performed by Dr. James Schuler, a vascular surgeon. Prior to the operation, Campbell was fully informed of the risks, including the risk of stroke, of this dangerous but necessary operation. When Campbell awoke from general anesthesia following the operation, Dr. Schuler discovered that Campbell had suffered a stroke.[1]

Blood is supplied to the brain from four vessels: the left and right internal carotid arteries and the left and right vertebral arteries. Campbell's left and right vertebral arteries were functioning adequately. However, medical tests revealed a 50%

1. Campbell did not die until January 1988, however. This is not a wrongful death case; it is only a medical malpractice case.

"stenosis" (or narrowing) of Campbell's left internal carotid artery; they also indicated that his right internal carotid artery was completely "occluded" (or obstructed).[2]

A *right* CE was out of the question, for it is standard medical practice never to operate on a completely occluded artery because of the high risk of stroke. Dr. Schuler, therefore, decided to perform a *left* CE on Campbell. Both parties agree that a *left* CE was necessary given the patient's condition and symptoms. Campbell's operation involved even a greater risk of stroke than other CEs because Campbell's opposite side carotid was completely occluded. An opposite side blockage such as this is known as a "contralateral occlusion."

During the operation, Campbell's arteries on his left side were clamped for 40 minutes, a medically acceptable length of time. At the conclusion of the operation, an ultrasound was performed on the patient, which showed the carotid artery repaired with a normal lumen or interior. There was no evidence of residual plaque in the artery or blood clots forming at the suture line or constriction of the artery. In the opinion of defendant's expert witness, Dr. William Baker, the ultrasound indicated that Dr. Schuler had performed a technically perfect operation. When Campbell awoke from general anesthesia, however, Dr. Schuler discovered that Campbell had suffered a stroke.

Dr. Schuler performed the operation without the use of a shunt. A shunt is a plastic tube used as a bypass for continued carotid blood flow during the operation. It was Dr. Schuler's practice in 1984 to never shunt a patient during a CE. Dr. Schuler's practice of never using a shunt was based on four factors:

(1) he was trained not to use a shunt when performing a CE;

(2) his stroke rate was excellent without utilizing a shunt;

(3) it is easier to perform a technically perfect operation without a shunt in the way; and

(4) nothing in the medical literature convinced him that his stroke rate would improve by using a shunt.

There is a risk trade-off involved in the use of a shunt. Dr. Schuler was fully aware of the relative advantages and disadvantages of using a shunt prior to operating on Campbell. Although CEs are performed to prevent stroke, stroke is a known risk of such an operation. A stroke can be caused either by emboli (small blood clots that lodge in blood vessels in the brain) or by ischemia (lack of blood flow to the brain). The medical literature attributes strokes more often to emboli than to ischemia. The use of a shunt *increases* the risk of stroke caused by emboli. There are also other risks associated with the use of a shunt, such as damage to vessel walls caused by its insertion. On the other hand, the use of a shunt improves blood flow to the brain and may therefore *decrease* the risk of stroke caused by brain ischemia. At the time of Campbell's operation, Dr. Schuler believed that the risks involved with the use of a shunt outweighed any benefits.

In 1984, surgeons who performed CEs fell into three groups:

(1) those who always used a shunt;

(2) those who selectively used a shunt depending on varying criteria; and

(3) those who never used a shunt.

Prior to the time of Campbell's operation (and still today), there existed a substantial debate in the medical community regarding the relative advantages and disadvantages to these three approaches. The stroke rate in each of the three categories of surgeons was in 1984 and is today about the same.

In 1984, Dr. Schuler's stroke rate was approximately 3%. Both doctors testifying as expert witnesses agreed that a stroke rate of less than 5% is medically acceptable. Sometime in 1985, Dr. Schuler altered his approach as to the use of a shunt

---

**2.** The supply of blood to Campbell's brain from the right side was reconstituted (at least partially), though, via the ophthalmic artery via facial and internal maxillary arteries. This is known as "collateral blood flow."

and now selectively shunts in limited cases depending on strict criteria. Today, Dr. Schuler shunts only about 10% of his patients. Since altering his approach, Dr. Schuler's stroke rate has remained the same—approximately 3%.

Campbell brought this suit against the United States under the Federal Tort Claims Act. Prior to trial, Campbell died; his son Aaron Campbell, as Special Administrator of the Estate of Raymond Campbell, was substituted as the named plaintiff. The complaint alleges that Dr. Schuler, an employee of the VA hospital, committed medical malpractice when performing the left carotid endarterectomy on Campbell. Specifically, the plaintiff alleges that Dr. Schuler was negligent in failing to use a shunt and in failing to monitor collateral blood flow.

After a three day bench trial, the district court entered judgment in favor of the defendant. *Findings of Fact and Conclusions of Law*, dated May 11, 1989 [hereafter referred to as the *District Court Opinion* ]. In rendering its decision, the district court credited highly the testimony of Dr. Baker, the defendant's expert witness; however, it discredited the testimony of Dr. Carter, the plaintiff's expert witness. *District Court Opinion*, p. 24. The district court stated that Dr. Carter's opinions were "based on many levels of speculation and assumptions based on those speculations" and that Dr. Carter had testified "in the worst tradition of the expert witness." *Id.* at 17–19.

The district court first concluded that Dr. Schuler "plainly satisfied" the standard or care of a reasonably well-qualified surgeon "and may fairly be found to have met even the more demanding standard ('highest degree of skill possible')." *Id.* at 23. Second, the district court concluded that the plaintiff had failed to prove proximate causation, referring to the plaintiff's proof regarding causation as "speculative." *Id.* at 24. In short, the district court concluded: "By every objective standard Dr. Schuler's conduct was impeccable in medical and surgical terms." *Id.* at 21.

## II.  ANALYSIS

The Federal Tort Claims Act ("FTCA") provides in part: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. The FTCA "was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States,* 369 U.S. 1, 6, 82 S.Ct. 585, 589, 7 L.Ed.2d 492 (1962). A case brought under the FTCA is governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *see Richards,* 369 U.S. at 9–10, 82 S.Ct. at 591. Thus, this medical malpractice case is controlled by the law of the state of Illinois.

> Under Illinois law,
> [t]he elements which must be proved by a plaintiff to establish medical malpractice are: (1) the standard of care by which the physician's treatment is measured; (2) a deviation from that standard; and (3) that the deviation proximately caused the plaintiff's injury. Proof of these elements is generally based upon expert testimony....

*Ramos v. Pyati,* 179 Ill.App.3d 214, 128 Ill.Dec. 290, 293, 534 N.E.2d 472, 475 (1989) (citations omitted). *See also Purtill v. Hess,* 111 Ill.2d 229, 95 Ill.Dec. 305, 310, 489 N.E.2d 867, 872 (1986). The district court found that the plaintiff had failed to prove all three elements of his *prima facie* case. *District Court Opinion,* p. 24. We agree.

### A.  Deviation from the Standard of Care

Illinois law "requires a physician to possess and to apply that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances." *Purtill v. Hess,* 111 Ill.2d 229, 95 Ill.Dec. 305, 310,

489 N.E.2d 867, 872 (1986).[3] The question of whether a doctor deviated from the relevant standard of care is a question of fact. *Borowski v. Von Solbrig*, 60 Ill.2d 418, 328 N.E.2d 301, 305 (1975); *Kaplan v. Berger*, 184 Ill.App.3d 224, 132 Ill.Dec. 461, 467, 539 N.E.2d 1267, 1273 (1989). In this case, the district court served as the trier of fact and entered its findings of fact in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. Under Rule 52(a), a district court's findings of fact will not be disturbed on appeal unless they are "clearly erroneous."[4] The district court found that Dr. Schuler had "plainly satisfied" the standard of care which a reasonably well-qualified physician would use under similar circumstances "and may fairly be found to have met even the more demanding standard ('highest degree of skill possible')." *District Court Opinion*, p. 23. We must decide, therefore, whether the district court was clearly erroneous in finding that Dr. Schuler's conduct did not deviate from the relevant standard of care.

■ We begin our analysis by stating three fundamental principles of law applicable in the context of medical malpractice actions. First, the mere fact that an operation does not result in a favorable outcome does not establish—or even constitute evidence of—a deviation from the standard of care. *Crawford v. Anagnostopoulos*, 69 Ill.App.3d 954, 26 Ill.Dec. 234, 239, 387 N.E.2d 1064, 1069 (1979) ("Proof of a bad result or mishap is not evidence of lack of skill or negligence."). The law does not impose strict liability on surgeons every time an operation is "unsuccessful." It is undisputed that Campbell suffered a stroke

during the operation, but that fact proves nothing.

■ Second, differences of medical opinion as to how best to treat a patient are consistent with the exercise of due care. This principle has been forcefully articulated by the Illinois Supreme Court as follows:

It is insufficient for plaintiff to establish a *prima facie* case merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science. It is rather a profession which involves the exercise of individual judgment within the framework of established procedures. Differences of opinion are consistent with the exercise of due care.

*Walski v. Tiesenga*, 72 Ill.2d 249, 21 Ill. Dec. 201, 207, 381 N.E.2d 279, 285 (1978); *see also Piano v. Davison*, 157 Ill.App.3d 649, 110 Ill.Dec. 35, 48, 510 N.E.2d 1066, 1079 (1987).

■ Third, the trier of fact is to determine the weight to be given to the testimony of expert medical witnesses, and this court will "defer to the credibility assessments made by the trier of fact." *Payne v. United States*, 711 F.2d 73, 76 (7th Cir. 1983); *see also Cicero v. United States*, 812 F.2d 1040, 1042 (7th Cir.1987). In the present case, the district court, serving as the trier of fact, discredited the testimony of Dr. Carter, the plaintiff's expert witness, stating that Dr. Carter's testimony lacked credibility. *District Court Opinion*, pp. 23–24. We defer to the credibility determinations made by the trial court in

---

**3.** In determining the standard of care against which the defendant doctor's conduct is judged, Illinois courts have followed the "similar locality" rule. *Purtill*, 95 Ill.Dec. at 310, 489 N.E.2d at 872. In this case, the district court applied a nation-wide standard to define the relevant medical community.

**4.** *See* Fed.R.Civ.Pro. 52(a) ("In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall

be given to the opportunity of the trial court to judge the credibility of the witnesses."). *See also Cicero v. United States*, 812 F.2d 1040, 1041–42 (7th Cir.1987).

Plaintiff's counsel argues that, because of the complex and scientific nature of the evidence presented at trial, "this Court is in as good a position to determine the substantive facts as was the district court." Plaintiff's *Reply Brief,* p. 11. We decline the invitation of plaintiff's counsel to retry the facts of this case on appeal; instead, we apply the clearly erroneous standard of review to the trial court's factual findings.

this case, which we find amply supported by the record.

With these three principles of law in mind, we turn to the facts of this case. The district court credited highly the testimony of Dr. Baker, the defendant's expert witness. Dr. Baker testified that in 1984 all three categories of surgeons (*i.e.*, those who always, never, and selectively shunted) fell within the appropriate standard of care for performing a carotid endarterectomy. The three categories, he testified, merely outlined the various techniques for performing the operation—all of which were medically acceptable. Dr. Baker stated that Campbell's surgery was necessary, that Dr. Schuler employed appropriate surgical techniques and maintained an acceptable clamp time, and that ultrasound tests performed after the operation revealed that Dr. Schuler performed a technically perfect operation.

Dr. Carter, the plaintiff's expert witness, testified that he would have utilized several surgical techniques, including shunting, that Dr. Schuler did not utilize. However, differences of medical opinion are not inconsistent with the exercise of due care. *Walski v. Tiesenga*, 72 Ill.2d 249, 21 Ill. Dec. 201, 207, 381 N.E.2d 279, 285 (1978) ("It is insufficient for plaintiff to establish a *prima facie* case merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science."). Based on the record as a whole, we conclude that the district court's factual finding that Dr. Schuler's conduct did not deviate from the standard of care was not clearly erroneous.

### B. Proximate Causation

We will next review the district court's finding with regard to the third element of the plaintiff's case: proximate causation. Under Illinois law, proximate causation is a question of fact. *Borowski v. Von Solbrig*, 60 Ill.2d 418, 328 N.E.2d 301, 305 (1975); *Kaplan v. Berger*, 184 Ill.App.3d 224, 132 Ill.Dec. 461, 467, 539 N.E.2d 1267, 1273 (1989). Thus, we will again apply the clearly erroneous standard of review. Consequently, the question we must decide on appeal is whether the district court was clearly erroneous in finding that Dr. Schuler's alleged negligence (*i.e.*, failure to shunt or to monitor collateral blood flow) did *not* proximately cause Campbell's stroke. We find that it was not.

Indeed, the district court's factual finding with regard to causation is amply supported by the evidence presented at trial and by the law as it exists in Illinois.

> The Illinois Supreme Court has stated that to prove causation in a medical malpractice action, the plaintiff must establish that it is more probably true than not true that the negligence was a proximate cause of the injury. To prove proximate cause, the plaintiff must establish that the defendant's negligence was a cause in fact of the [injury]. If the [injury] would have occurred even in the absence of negligence, the negligence was not a cause in fact of the [injury]. The element of cause in fact need not be proved to a certainty. Rather, the evidence is sufficient if it affords the jury a reasonable basis to conclude that the negligence was "probably" or "more likely than not" a cause of the [injury].

*Hare v. Foster G. McGaw Hosp.*, 192 Ill. App.3d 1031, 140 Ill.Dec. 127, 130, 549 N.E.2d 778, 781 (1989) (citations omitted).[5] The district court found that the evidence presented at trial did *not* establish that it is more probably true than not true that the alleged negligence of Dr. Schuler was a

---

5. *See also Pumala v. Sipos*, 163 Ill.App.3d 1093, 115 Ill.Dec. 93, 96, 517 N.E.2d 295, 298 (1987) ("In a medical malpractice case, plaintiff must prove that it is more probably true than not true that defendant's negligence was a proximate cause of the plaintiff's injury."); *Hare*, 140 Ill. Dec. at 132, 549 N.E.2d at 783 ("Although we recognize the problems inherent in requiring a plaintiff to prove that the doctor's negligence was more probably than not a proximate cause of [the injury], this is clearly the burden of proof in medical malpractice actions as set forth by the Illinois Supreme Court in *Borowski* [*v. Von Solbrig*, 60 Ill.2d 418, 328 N.E.2d 301 (Ill. 1975)].").

proximate cause of Campbell's stroke. This finding was not clearly erroneous.

The risk of stroke is, unfortunately, inherent in a CE operation. Despite medical advances, a CE remains a delicate and dangerous operation. The risks to Campbell were even greater than usual because he had a contralateral occlusion and heart problems. Dr. Schuler carefully communicated these risks to Campbell prior to his operation. The plaintiff's expert witness, Dr. Carter, testified that the CE operation caused Campbell's stroke. But that is not the relevant question. Rather, the question is whether Dr. Schuler's alleged negligence, not the operation itself, was a proximate cause of the stroke. *See Pumala v. Sipos,* 163 Ill.App.3d 1093, 115 Ill.Dec. 93, 96, 517 N.E.2d 295, 298 (1987).

As the expert witnesses for both parties testified, the simple fact is that strokes can and do occur during CE operations—even absent negligence.[6] Plaintiff has proven only that Campbell suffered a stroke during the operation; he has not shown that Dr. Schuler's alleged negligence caused that stroke. As previously stated, the mere fact that the operation did not result in a favorable outcome does not establish— or even constitute evidence of—negligence or proximate causation. *Crawford v. Anagnostopoulos,* 69 Ill.App.3d 954, 26 Ill. Dec. 234, 239, 387 N.E.2d 1064, 1069 (1979).

The plaintiff argues that "defendant's failure to protect plaintiff decedent's brain from cerebral ischemia proximately caused his stroke." Plaintiff's *Reply Brief,* p. 11. However, in making this argument, the plaintiff erroneously assumes a fact *not* established at trial, namely, that Campbell's stroke was caused by ischemia (lack of blood flow to the brain) and not by emboli (a blood clot). The medical evidence presented at trial indicates that strokes are more often caused by emboli than by ischemia during a CE. To assert that Campbell's stroke was caused by ischemia rather than emboli is, in the words of the district

court, only "a matter of speculation." The case law in Illinois is clear: "Proximate cause is not established, however, where the causal connection is 'contingent, speculative, or merely possible.'" *Newell v. Corres,* 125 Ill.App.3d 1087, 81 Ill.Dec. 283, 286, 466 N.E.2d 1085, 1088 (1984).

### III.  CONCLUSION

We conclude that the district court was not clearly erroneous in finding that Dr. Schuler's conduct did not deviate from the relevant standard of care. As an independent basis for affirming the district court, we conclude that the district court's factual finding with regard to proximate causation was not clearly erroneous. For these reasons, the judgment of the district court is AFFIRMED.

---

**6.** This fact precludes plaintiff's use of the doctrine of *res ipsa loquitur* to establish medical negligence in this case. Under Illinois law, "[r]es ipsa loquitur is applicable in medical malpractice cases where the conduct of the doctor is grossly remiss or so contrary to acceptable and customary medical practices and standards shown of record *that results or injuries complained of would not have occurred but for negligence.*" *Gatlin by Gatlin v. Ruder,* 178 Ill. App.3d 1059, 128 Ill.Dec. 157, 158, 534 N.E.2d 177, 178 (1989) (emphasis added).