GREYNOLDS et al., Appellees,

v.

KURMAN, Appellant, et al.

[Cite as *Greynolds v. Kurman* (1993), 91 Ohio App.3d 389.]

Court of Appeals of Ohio,
Summit County.

No. 16038.

Decided Nov. 3, 1993.

*Patrick J. Hart,* for appellees.

*David M. Best, Janis L. Small* and *Cheryl A. O'Brien,* for appellant.

---

EDWARD J. MAHONEY, Judge.

Defendant-appellant, Andrew Kurman, M.D., appeals from a jury verdict rendered against him in favor of plaintiff-appellee, K. Jack Greynolds, in a medical malpractice action. The malpractice action arose after Dr. Kurman performed a cerebral angiogram on Greynolds which caused Greynolds to suffer a stroke. We affirm.

### Factual Background

In late July 1987, Greynolds and his wife, Mary Greynolds, visited relatives in Charleston, West Virginia. During the visit, Greynolds suffered from a transient ischemic attack ("TIA") on July 29. A TIA is "a sudden loss of neurological function" caused by "vascular impairment to the brain." Stedman's Medical Dictionary (25th Ed. 1990) 152. TIAs are usually brief attacks that pass with "no persistent neurological deficit." Sloan–Dorland Annotated Medical–Legal Dictionary (1992 Supp.) 41. In layman's terms, "TIAs are warning signs of an impending stroke." *Id.,* citing *Campbell v. United States* (C.A.7, 1990), 904 F.2d 1188, 1189. On at least two previous occasions since 1979, Greynolds had suffered from TIAs.

As a result of the TIA in West Virginia, Greynolds had garbled speech and expressive and perceptive aphasia. "Aphasia" is a medical term used to describe the "loss of the power of expression by speech, writing, or signs, or of comprehending spoken or written language." Sloan–Dorland Annotated Medical–Legal Dictionary (1987) 44.

On July 29, 1987, Greynolds was transferred to the Akron General Medical Center. Upon arriving in the Akron General emergency room, the Greynoldses were met by Greynolds's cardiologist, Dr. Litman. At Dr. Litman's request, Dr. Jose Rafecas, a medical neurologist, examined Greynolds. Dr. Rafecas deter-

mined that because of Greynolds's past medical history, which included previous TIAs, he was at a high risk for a stroke, and sought to pinpoint the exact source of vascular insufficiency to the brain.

Dr. Rafecas placed Greynolds on the drug Heparin, and ordered that a technician perform Doppler and ultrasound studies on the carotid arteries in Greynolds's neck. The Doppler and ultrasound studies were noninvasive tests performed to determine whether there existed any lesions in the arteries which could be surgically treated. The test results showed a mild amount of atherosclerosis in Greynolds's carotid artery, but did not pinpoint the source of his TIAs.

After receiving the results of the noninvasive tests, Dr. Rafecas ordered that Greynolds undergo a cerebral angiogram. A cerebral angiogram is an invasive procedure by which a catheter is inserted into the femoral artery in a patient's groin. The catheter runs through the arterial system into the carotid artery in the neck. Then, contrast dye is injected into a patient's carotid arteries so that doctors can study the vessels supplying blood to the brain. The procedure is not without risks. It can cause spasms in the vascular walls, thus restricting the blood supply to the brain, or plaque can be dislodged within the arterial system, causing an occlusion. Also, the contrast dye used in the procedure can produce a reaction which causes an occlusion. If one of the aforementioned incidents occurs during the procedure, it may restrict a patient's blood supply to the brain, and a patient can suffer a stroke. During the trial, expert witnesses for both sides explained that during cerebral angiograms performed upon healthy patients, two to three percent of the patients suffer from a stroke as a result of the procedure.

Before Dr. Kurman performed the cerebral angiogram on Greynolds, members of the "operating team" had Greynolds sign two consent forms. On July 31, 1987, Greynolds signed a consent form which was presented and explained to him by Nurse Joanna Rupright. Rupright, a nurse for thirty years, obtains consents for most special procedures, including cerebral angiograms, done in the radiology department at Akron General. On August 3, 1987, at approximately 7:00 a.m., Jeffrey Holland, a radiology technician, obtained Greynolds's signature on a second consent form. The operating team approached only Greynolds for consent; they did not inform Mrs. Greynolds or her immediate family about the angiogram.

On August 3, 1987, Dr. Kurman returned to work at Akron General after a two-week family vacation. Upon arriving at the hospital at approximately 7:30 a.m. that morning, Dr. Kurman met Dr. Rafecas in the parking lot. There Dr. Rafecas informed Dr. Kurman that he had scheduled Greynolds for an angiogram that morning. Dr. Kurman stated at trial that his "review of [Greynolds's] chart indicated the presence of informed consent." Later that morning, Dr. Kurman

performed the angiogram; Greynolds suffered a stroke during the procedure which left him severely disabled.

Greynolds and his wife filed a medical malpractice action against Akron General Medical Center, Dr. Rafecas, and Dr. Kurman. Akron General Medical Center was dismissed from the case without prejudice. Plaintiffs maintained their claims against both doctors, asserting that Dr. Rafecas negligently recommended the operation, and that Dr. Kurman had operated without obtaining the informed consent of Greynolds. The claims against the doctors were arbitrated. Plaintiffs rejected the arbitrator's award of $400,000, and the case proceeded to a jury trial. On August 31, 1992, the jury returned a verdict in favor of Dr. Rafecas, but against Dr. Kurman, awarding a total of one million dollars, $575,000 to Greynolds and $425,000 to Mrs. Greynolds. The trial court entered judgment on the verdict on September 15, 1993. Dr. Kurman has appealed the judgment to this court, and has raised three assignments of error.

### Assignment of Error I

"The trial court erred by refusing to enter judgment for Dr. Kurman consistent with the answer to jury interrogatory number three."

In his first assignment of error, Dr. Kurman argues that the trial court should have entered judgment in his favor because of an apparent inconsistency between the jury's general verdict and the jury's answer to special interrogatory number three. At the request of Dr. Kurman's counsel, the jury answered three special interrogatories with respect to the claims against Dr. Kurman. These interrogatories served to track the jury's understanding of the tort of lack of informed consent.

In 1985, the Supreme Court of Ohio set out the elements of an action for lack of informed consent in *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 17 OBR 281, 477 N.E.2d 1145, syllabus:

"The tort of lack of informed consent is established when:

"(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

"(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and,

"(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy."

The three interrogatories returned by the jury read as follows:

"*Interrogatory No. 1:* Do you find there was a failure to obtain informed consent?

"*ANSWER:* Yes.

"*Interrogatory No. 2:* If you answered Interrogatory No. 1 yes, then state specifically in what manner Dr. Kurman's care fell below the recognized standards of the medical community?

"*ANSWER:* Mr. Greynolds was not in our estimation capable of comprehending the consent form. Therefore, Dr. Kurman should have obtained consent from the next-of-kin, specifically, Mrs. Greynolds.

"*Interrogatory No. 3:* If you answered yes to interrogatory Number one and you found that Mr. Greynolds did not consent to the procedure, do you find that a reasonable person would have consented to the procedure?

"*ANSWER:* Yes."

The jury also signed a general verdict for the plaintiffs, allocating $575,000 in damages to Greynolds and $425,000 in damages to Mrs. Greynolds.

When the jury returned from its deliberations, the trial court read the special interrogatories and answers, and read the general verdict. Then the following dialogue took place between the court, jury and counsel:

"THE COURT: Any questions? Members of jury, on behalf of the Court, I certainly extend a sincere thanks to you. You have approached this case diligently and certainly have given it your attention. You are excused from this case now and are free to leave. You can discuss the case with anybody you care to from this point on.

"MS. O'BRIEN: Your Honor, may we approached [*sic*] just prior to their being excused?

"THE COURT: Yes.

"(Discussion off the record.)

"THE COURT: You are excused ladies and gentlemen."

Then, defendant's counsel moved the trial court to set aside the general verdict and grant Dr. Kurman a judgment notwithstanding the verdict because the jury's answer to interrogatory number three was inconsistent with the jury's general verdict. The trial court initially refused to grant defendant's motion, but allowed trial counsel to submit briefs on the issue. The court formally entered the jury's general verdict on September 15, 1992. In a journal entry filed on October 20, 1993, the trial court overruled Dr. Kurman's motion for a judgment notwithstanding the verdict.

Under the Ohio Rules of Civil Procedure, when one or more of the jury's answers to special interrogatories are inconsistent with the jury's general verdict, the trial court may (1) enter judgment in accordance with the answers, notwithstanding the general verdict; (2) return the jury for further consideration of its answers; or (3) order a new trial. Civ.R. 49(B). In this case, the trial court did not take the action mandated by the Ohio Rules of Civil Procedure; however, in this case, defendant did not make a timely objection to the inconsistency between the special interrogatories and the general verdict.

In *Haehnlein v. Henry* (1987), 41 Ohio App.3d 233, 234, 535 N.E.2d 343, 344, this court held that a party must object to an inconsistency between an answer to a special interrogatory and a general verdict before the jury is discharged. In that case, we noted that under Federal Rule of Civil Procedure 49(B), a provision similar to Civ.R. 49(B), several federal circuit courts had also required a formal objection be made to an inconsistent interrogatory before the jury is excused. Moreover, this court noted two main policy rationales for this requirement: (1) to promote the efficiency of trials by permitting the reconciliation of inconsistencies without the need for a new presentation of evidence to a different trier of fact, and (2) to prevent jury shopping by litigants who might wait to object to an inconsistency until after the original jury is discharged. *Id.* After the decision in *Haehnlein,* this court reaffirmed the "waiver rule" in *Midwest Specialties, Inc. v. Firestone Tire & Rubber Co.* (1988), 42 Ohio App.3d 6, 536 N.E.2d 411, and the Ohio Supreme Court implicitly adopted the rule in *O'Connell v. Chesapeake & Ohio RR. Co.* (1991), 58 Ohio St.3d 226, 229, 569 N.E.2d 889, 892.

In spite of the apparently well-settled case law in this area, appellant argues that the unique facts of this case mandate a directed verdict for defendant. Appellant specifically points to the interaction between the jury and the trial court while the jury deliberated its verdict. While the jury conducted its deliberations, it sent several questions to the trial court concerning special interrogatory number three. The jury wanted to know whether a "yes" answer to that interrogatory would negate a finding of informed consent. At one point, the trial judge recalled the jury, and the judge read and answered one of the jury's questions as follows:

"THE COURT: * * * What is the point of completing interrogatory number 3? Now first of all you don't have to complete any interrogatory, if you cannot agree on it.

"If we sign yes, does that negate question one or two and change any negligence? Under the law, if you sign yes to number 3, it negates a finding of lack of consent. It negates that. Does that answer your question?

"JUROR NO. 5: Yes."

Defendant argues that because of the extensive communication between the trial judge and the jury, the jury intended to find for defendant because it knew that a "yes" answer to special interrogatory number three negated a finding of lack of informed consent.

While the extensive communication between the trial judge and the jury presents a unique factual scenario, we cannot say that it carves out an exception to the rule that an objection must be made to an inconsistent interrogatory before the jury is discharged. We find no case law to support appellant's argument that this court should create such an exception. Moreover, the fact that the communications between the jury and judge took place in front of trial counsel should have put appellant's trial counsel on notice of the need to immediately object when the jury returned with its verdict and answers.

Finally, appellant contends that we should reach the inconsistency issue in this case because the trial court committed plain error by failing to set aside the jury verdict. In support of this argument, appellant cites *O'Connell, supra. O'Connell* was a comparative negligence case in which a jury found the plaintiff to be seventy percent negligent. As a result, the trial court directed a verdict for defendant. Plaintiff moved for a judgment notwithstanding the verdict after the trial court had excused the jury. Plaintiff based her motion on the fact that not all of the jurors who signed an interrogatory finding negligence and probable cause signed the interrogatory which apportioned the percentage of negligence.

In *O'Connell*, the Ohio Supreme Court implicitly adopted the waiver rule established by this court in *Haehnlein, supra.* The court stated that, generally, an objection to inconsistent interrogatory answers is waived unless a party raises the objection before the jury is discharged. *O'Connell,* 58 Ohio St.3d at 229, 569 N.E.2d at 892. Nevertheless, the court applied the "plain error" doctrine to reach the inconsistency. It held that the plain error doctrine applied because in that particular case a failure to apply the plain error doctrine would have created a manifest miscarriage of justice. *Id.* at 230, 569 N.E.2d at 892. The court then reached the issue of the inconsistency and established the "same juror" rule for comparative negligence cases in Ohio.

This case does not provide one of the rare occasions in which the plain error doctrine should be invoked to prevent a manifest miscarriage of justice. Here, the same six jurors who signed the three special interrogatories signed the general verdict. Also, as mentioned previously, the jury and judge in open court had extensive communications about the effect of a "yes" answer to interrogatory number three. Thus, appellant's counsel should have been aware of the necessity of raising an immediate objection.

Accordingly, we find that appellant waived the right to assign error to any alleged inconsistency between special interrogatory number three and the gener-

al verdict because appellant failed to make a timely objection before the trial court excused the jury. Appellant's first assignment of error is overruled.

## Assignment of Error II

"The judgment in favor of plaintiffs is not supported by sufficient evidence as a matter of law."

In determining whether a judgment in a civil case is supported by sufficient evidence, this court examines whether the judgment is supported by some competent, credible evidence going to all the essential elements of the case. See *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. Here, the jury needed to determine that the risks involved in the cerebral angiogram were not disclosed to Greynolds, that the risks involved in the procedure materialized and caused Greynolds's stroke, and that a reasonable person in the position of Greynolds would have decided against having the angiogram had the risks associated with the procedure been disclosed to him. *Nickell v. Gonzalez, supra.*

The jury concluded that Greynolds did not consent to the angiogram because he "was not * * * capable of comprehending the consent form," and further noted that Dr. Kurman should have sought consent from the next of kin, specifically Mrs. Greynolds. The testimony of Dr. Gary Kaplan, plaintiff's expert medical witness, supported the jury's conclusion. He stated that Greynolds's hospital records indicated that "there was enough of a question as to [Greynolds's] ability to comprehend that * * * he did not possess enough cognitive language skill to give consent to [the angiogram]." Further, after Dr. Rafecas examined Greynolds on July 31, 1993, he noted that Greynolds had problems understanding complex commands. At trial, Dr. Rafecas testified that, after the July 31, 1993 examination, he "had concerns" whether Greynolds could give his informed consent to the. angiogram.

Also, the trial produced evidence that the cerebral angiogram caused Greynolds's stroke. Plaintiff's expert, Dr. Gary Kaplan, opined that an embolic event occurred during the angiogram in which plaque was released from the arteries, occluded a cerebral artery, and caused the stroke. Moreover, defendant's expert, Dr. Michael Mordic, admitted during cross-examination that the August 3, 1993 angiogram caused Greynolds's stroke.

Finally, evidence was presented at trial demonstrating that a reasonable person in the position of the plaintiff would not have consented to the angiogram. Plaintiff's expert testified that, in general, an angiogram carries a two to three percent risk of a stroke. Moreover, he noted that if a patient has recently had a "neurological event," such as a TIA, the risk of a complication during a cerebral angiogram increases.

Although Greynolds had consented to similar procedures earlier in his life, there was evidence before the court that he would not have consented to similar procedures in the future. During the late 1970s, Greynolds had a major heart attack followed by multiple arteriograms and bypass surgery. Mrs. Greynolds testified that through these procedures she and her husband discovered that he had a known history of atherosclerosis, and would not have consented to the cerebral angiogram. Moreover, the jury heard testimony regarding a note written to Greynolds by his cardiologist, Dr. Litman, on July 25, 1980, in which Dr. Litman advised Greynolds that he should not undergo another coronary arteriography.

Given the evidence of plaintiff's condition when he signed the consent forms, his past medical history, and the fact that he was at an increased risk to suffer complications during an angiogram, we find that sufficient, competent, credible evidence existed to support a finding of lack of informed consent. Accordingly, defendant's second assignment of error is overruled.

### Assignment of Error III

"The jury verdict in the amount of $1,000,000 was excessive and against the manifest weight of the evidence."

In reviewing a jury's award of damages, this court will not set aside the award unless it is so excessive that it appears to have been the result of passion or prejudice, or is manifestly against the weight of the evidence. *Cardinal Fed. S. & L. Assn. v. Michaels Bldg. Co.* (May 8, 1991), Summit App. No. 14521, unreported, at 16, 1991 WL 76870. To determine if a verdict is excessive, we look to whether competent, credible evidence was presented at trial to support it. *Id.*

The August 3, 1987 stroke left Greynolds severely debilitated. He is globally aphasic and cannot speak. Although he recognizes friends and family, he can communicate with them only through gestures. He suffers from paralysis throughout the right side of his body, and has limited motor skills. He cannot function without the constant attention of his wife.

Appellant argues that the damages were excessive because even if Greynolds did not undergo an angiogram, he would have suffered from a stroke anyway. Although the evidence adduced at trial indicated that Greynolds was more likely to have a stroke than an average person, there was no overwhelming evidence that he would suffer from a stroke at a definite date in the near future.

The hospital records indicated that before the cerebral angiogram, Greynolds was slowly recovering from the TIA. Plaintiffs' expert, Dr. Gary Kaplan, testified that if defendant had not performed the angiogram, Greynolds would have recovered and returned to his pre-TIA condition. Dr. Kaplan further

testified that for a patient whose past medical history included multiple TIAs or a serious TIA, the risk of that patient suffering a major TIA or stroke would cumulatively increase by five percent each year. Appellant also agreed with Dr. Kaplan's figures. Dr. Rafecas disagreed with appellant's figures, and estimated the risk that a person in the position of the plaintiff would suffer a major TIA or stroke would cumulatively increase fifteen percent each year. Nevertheless, Dr. Rafecas indicated that after three to four years, that risk would level off to about forty to fifty percent.

Given Greynolds's past medical history of TIAs starting in 1979, the testimony of the experts indicates that he had a forty to fifty percent chance of suffering from a major TIA or stroke in the future. These numbers do not definitively indicate that Greynolds would have suffered from a major stroke at a definite point, or by a certain date.

In light of the particular facts of this case, we find that the verdict was not the result of passion or prejudice, and that competent, credible evidence supported the jury's award of $575,000 to Greynolds and $425,000 to Mrs. Greynolds. Appellant's third assignment of error is overruled.

### Assignment of Error IV

"The trial court erred to the prejudice of Dr. Kurman by instructing the jury that Dr. Kurman had the sole responsibility to give [*sic*] informed consent, and in overruling Dr. Kurman's proposed jury instruction dealing with the delegability of that duty."

The instruction to the jury about the tort of lack of informed consent read, in pertinent part, as follows:

"The plaintiffs also have posed a claim as to Dr. Kurman for lack of informed consent. To recover on this claim, the plaintiffs must prove to you by the greater weight of the evidence that the defendant failed to disclose to and discuss with the plaintiffs the material risks and dangers inherently and potentially involved with respect to the proposed treatment or procedure, and the undisclosed risks and dangers that should have been disclosed by the defendant did in fact happen and are the direct cause of injury to the plaintiff, and a reasonable person in the plaintiff's position would have decided against the treatment or procedure if the material risks and dangers inherent and incidental to it had been disclosed to him or her prior to the treatment or procedure.

" * * *

"Every adult has the right to determine what shall be done with his or her body and is entitled to be informed about the risks in treatment recommended by his or her physician.

"The physician has the duty arising out of the patient-physician relationship to disclose to the patient those risks of injury that should be known by a physician and that would influence a reasonable person's decision to consent to the treatment or procedure."

Appellant claims in his brief that "giving the [above] charge was tantamount to directing a verdict in this particular case" because the instruction did not "tell the jury that it was appropriate for Dr. Kurman to rely on hospital employees to obtain the informed consent * * *." We disagree.

While the instruction quoted above does state that the defendant failed to disclose and discuss with the plaintiffs the material risks and dangers associated with a cerebral angiogram, we find material what the instruction does not state. It does not state that there is a lack of informed consent unless the treating surgeon personally talks with the patient and watches them sign consent forms.[1] Instead, the instruction accurately tracks the wording of the syllabus of *Nickell v. Gonzalez, supra.* Moreover, the instruction is in accord with the well-settled legal principle that it is ultimately the physician's duty to obtain informed consent. See *Byrd v. Akron Gen. Med. Ctr.* (Feb. 18, 1987), Summit App. No. 12656, unreported, 1987 WL 6968.

Even if this court were to find the trial court's instructions on informed consent to be erroneous, the error would not have prejudiced defendant so as to warrant a new trial. Here, the jury did not base its finding of lack of informed consent on the fact that appellant failed to personally obtain plaintiff's consent. Rather, the jury found that there was a lack of informed consent because "Mr. Greynolds was not * * * capable of comprehending the consent form," and, therefore, "Dr. Kurman should have obtained consent from the next of kin, specifically, Mrs. Greynolds." Answer to Special Interrogatory No. 2.

We find that the trial court did not err in its instruction to the jury about the tort of lack of informed consent. Moreover, even if the court had given an erroneous instruction, that error would not warrant a new trial because of the jury's answer to Special Interrogatory No. 2. Appellant's fourth assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

COOK, P.J., and QUILLIN, J., concur.

---

1. We do not address the issue of whether Ohio's informed consent statute, R.C. 2317.54, or cases interpreting it require a physician to personally obtain informed consent.

EDWARD J. MAHONEY, J., retired, of the Ninth Appellate District, sitting by assignment.