GUREASKO, Appellant,

v.

BETHESDA HOSPITAL et al., Appellees.

[Cite as *Gureasko v. Bethesda Hosp.* (1996), 116 Ohio App.3d 724.]

Court of Appeals of Ohio,
First District; Hamilton County.

No. C-950713.

Decided Dec. 18, 1996.

*Rosenhoffer, Nichols & Schwartz* and *James A. Hunt,* for appellant.

*Taft, Stettinius & Hollister* and *Robert G. Stachler; Katz, Teller, Brant & Hild* and *Robert A. Pitcairn,* for appellees.

MARIANNA BROWN BETTMAN, Judge.

This appeal arises from the summary suspension of the medical staff privileges of plaintiff-appellant Michael A. Gureasko, M.D., from defendant-appellee Bethesda Hospital ("Bethesda" or "the hospital"). At the time of his suspension, Dr. Gureasko was a member of the Bethesda medical staff, specializing in psychiatry.

In order to address Dr. Gureasko's appeal, we must review his summary suspension, his fair hearing ("fairness hearing"), and the state tort claims he raised in the court of common pleas.

## PROCEDURAL BACKGROUND

On June 2, 1993, Dr. Gureasko was notified by letter that the Executive Committee of the Hospital Medical Staff was going to recommend to the Hospital Board of Trustees that his privileges be revoked, and that pending the outcome of that recommendation, his privileges were immediately suspended, meaning he could not admit or treat patients at the hospital. The hospital's bylaws [1] provide no process by which to contest a summary suspension; however, there is a provision for a fairness hearing on the recommendation to revoke a doctor's privileges, if requested in writing within thirty days. In this case, the summary suspension remained in place until after the fairness hearing.

Following notification of his summary suspension, Dr. Gureasko requested a fairness hearing, which took place over a number of months. The fairness hearing concluded with the recommendation that Dr. Gureasko's privileges be restored with the condition that he attend monthly meetings with the Department Director for a year. In January 1994, the hospital board accepted this recommendation and restored Dr. Gureasko's privileges.

Subsequently, Dr. Gureasko filed suit against Bethesda and two members of its psychiatry department, Pamela Lockwood and Phillip Edelstein.[2] His complaint alleged due process violations, tortious interference with his business relation-

---

1. R.C. 3701.351(A) requires the governing body of every hospital to set standards and procedures to be applied by the hospital and its medical staff in considering and acting upon applications for staff membership or professional privileges. Bethesda and its staff have several sources of governing rules, including the "Policy Governing Medical/Dental Staff Hearings, Appeals, and Other Actions." We will collectively refer to these rules as the "bylaws" unless otherwise noted.

2. Dr. Gureasko originally filed a claim against the hospital in July 1993. This complaint was later amended to include claims against the two named doctors.

Dr. Lockwood has been the director of the psychiatry department since January 1, 1993. Dr. Edelstein was the co-director of the psychiatry department during 1993. At that time, he was married to Dr. Lockwood.

ships, and defamation. He sought compensatory and punitive damages, and also requested that the occurrence of his summary suspension be expunged from his record. All defendants moved for summary judgment, which was granted by the trial court. This appeal ensued.

In his sole assignment of error, Dr. Gureasko argues that the trial court erred in granting summary judgment. The reasons why we disagree with this are complex, and involve an analysis of federal and state law.

## FEDERAL LAW

In 1986, Congress passed the Health Care Quality Improvement Act ("HCQIA"), which became fully operational September 1, 1990. One of the main purposes of HCQIA is "to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." H.R.Rep. No. 903, 99th Cong., 2d Sess. 2, reprinted in 1986 U.S.C.C.A.N. 6287, 6384, 6384. The part of HCQIA pertinent to this case involves immunity. Under HCQIA, those who take action in professional review committees which adversely affects a doctor's clinical privileges are protected from suit under both state and federal law so long as the action is taken in accordance with the following statutory standards:

"(1) in the reasonable belief that the action was in the furtherance of quality health care,

"(2) after a reasonable effort to obtain the facts of the matter,

"(3) after adequate notice and hearing procedures are afforded to the physicians involved or after such other procedures as are fair to the physician under the circumstances, and

"(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." Section 11112(a), Title 42, U.S.Code.

Section 11111, Title 42, U.S.Code provides immunity to hospitals and doctors for damages allegedly arising from a professional review action as long as the standards for professional review actions set out in Section 11112, *supra*, are followed.[3]

---

3. Section 11111(a)(1), Title 42, U.S.Code provides:
"If a professional review action of a professional review body meets all the standards specified in section 11112(a) of this title * * *
"(A) the professional review body,
"(B) any person acting as a member or staff to the body,
"(C) any person under a contract or other formal agreement with the body, and
"(D) any person who participates with or assists the body with respect to the action,

Additionally, the statute provides that a professional review action is presumed to have met the preceding standards unless the presumption is rebutted by a preponderance of the evidence. Section 11112(a), Title 42, U.S.Code.

HCQIA also provides immunity to those who provide information to professional review committees unless the information is false and the person providing it knows the information is false. Section 11111(a)(2), Title 42, U.S.Code.

Finally, while adequate notice and hearing procedures are required in professional review actions to maintain immunity, Section 11112, Title 42, U.S.Code specifically provides that nothing in the statute shall be construed as "precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such action may result in an imminent danger to the health of any individual." Section 11112(c)(2), Title 42, U.S.Code.

## STATE LAW

 Under Ohio law, a physician's staff privileges at a private hospital are protected by only minimal procedural due process.[4] These physicians are not employees of the hospital or of the state. Logically, then, a hospital board of trustees has broad discretion in the issuance, suspension, or denial of staff privileges. A provision in a hospital bylaw allowing a summary suspension of staff privileges is within the board's discretion as long as the suspension is carried out in the best interest of patient care and is reasonable. *Bouquett v. St. Elizabeth Corp.* (1989), 43 Ohio St.3d 50, 538 N.E.2d 113, paragraph one of the syllabus ("The board of trustees of a private hospital has broad discretion in determining who shall be permitted to have staff privileges. Courts should not interfere with the exercise of this discretion unless the hospital has acted in an arbitrary, capricious, or unreasonable manner, or in other words, has abused its discretion.").

 Additionally, under *Bouquett,* when hospital bylaws provide for summary suspension of a physician if such action "must be taken immediately in the best interest of patient care in the hospital," the term "best interest of patient care in the hospital" encompasses more than technical skills and professional competence of the physician. *Id.* at paragraph two of the syllabus.

---

"shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action. * * *"

**4.** A summary suspension is not the same as a license revocation proceeding.

Finally, R.C. 2305.25 creates statutory immunity under state law for hospitals with respect to peer review committee actions that are carried out within the scope and function of the committee. This statute provides:

"No hospital * * * shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the [professional review] committee." R.C. 2305.25.

Under R.C. 2305.251, the proceedings and records of all review committees described in R.C. 2305.25 are confidential and not subject to discovery in a civil action against a hospital unless they are otherwise available from other sources. The purpose of these two statutes is to provide for the immediate improvement of health care. "In no other professional area is the need for immediate remedial measures as essential or as important than in the health care profession." *Gates v. Brewer* (1981), 2 Ohio App.3d 347, 349, 2 OBR 392, 394, 442 N.E.2d 72, 75–76 (upholding the constitutionality of R.C. 2305.25 and 2305.251).

## THE DUE PROCESS ARGUMENT

Dr. Gureasko argues that the hospital had no adequate grounds on which summarily to suspend him, and that the summary suspension procedure at Bethesda violated his due process rights and was fundamentally unfair because the bylaws provide no way to challenge or to contest a summary suspension. Relatedly, he argues that his summary suspension was not implemented in accordance with the required statutory standards set forth in HCQIA, and that the appellees were not entitled to immunity. Therefore, he claims that the hospital and its medical staff should answer to him in damages.

The appellees contend that the suspension in this case was due to a health emergency, that the summary suspension was proper, and that they are entitled to immunity.

## PERMISSIBILITY OF SUMMARY SUSPENSIONS

■ We first hold that there is nothing about a summary suspension *per se* which violates a doctor's due process rights. Dr. Gureasko's staff privileges at Bethesda were summarily suspended on June 1, 1993, pursuant to Bethesda's Policy Governing Medical/Dental Staff Hearings, Appeals and Other Actions, which provides in Article III, Part F, Section 1(a):

"The president, the director of a clinical department, the chief executive officer, or in his absence, his designee, or the chairman of the board shall each have the authority to summarily suspend all or any portion of the clinical privileges of a Medical Staff appointee or other individual whenever such action is in the best interest of patient care or safety or the continued effective operation of the

Hospital or whenever such individual has violated the bylaws, policies and regulations of the Hospital or Medical Staff." [5]

■ Nothing in HCQIA prevents the summary suspension of a doctor's privileges. The hospital's bylaws specifically provide for a summary suspension under specified circumstances.[6] The suspension is clearly a part of the professional review process at Bethesda. Additionally, the use of a summary suspension as part of the professional review process is specifically approved by the Joint Committee on Accreditation of Hospitals.[7]

## HOSPITAL IMMUNITY UNDER HCQIA

■ Ordinarily, the party moving for summary judgment has the burden of proving that no material facts are at issue and that the movant is entitled to judgment as a matter of law. However, the presumption created by HCQIA gives rise to the following standard for summary judgment: "Might a reasonable jury, viewing the facts in the best light for [plaintiff], conclude that he has shown, by the preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" *Austin v. McNamara* (C.A.9, 1992), 979 F.2d 728, 734. This standard, which is analogous to the standard in Section 1983 actions, is applied because "Congress clearly intended HCQIA to permit defendants in suits arising out of peer review disciplinary decisions to file motions to resolve the issues concerning immunity from monetary liability as early as possible in the litigation process." *Bryan v. James E. Holmes Regional Med. Ctr.* (C.A.11,

---

**5.** Article III, Part F, Section 2 provides:

"The individual who exercises his authority under Section 1 of this Part to suspend summarily a person appointed to the medical staff shall immediately report his action to the Chairman of the Credentials Committee or the Chairman of the Executive Committee, whichever committee (depending on the reason for the suspension) shall be appropriate to take further action in the matter. An investigation of the matter resulting in summary suspension shall be completed within 14 days of the suspension or reasons for the delay shall be transmitted to the Board so that it may consider whether the suspension should be lifted. At that point the Committee to which the matter has been referred shall take such further action as is required in the manner specified under Part C of this Article for the Credentials Committee and Part D of this Article for the Executive Committee. The summary suspension shall remain in force after the appropriate committee takes responsibility unless and until modified by that committee or the Chief Executive Officer, or until the matter that required the suspension is finally resolved."

**6.** Bethesda concedes that in the implementation of the summary suspension, its bylaws were not complied with word for word, but that they were substantially complied with. We agree.

**7.** "Medical staff bylaws must include provisions for * * * [m]echanisms for corrective action, including indications and procedures for automatic and summary suspension of an individual's medical staff membership and/or clinical privileges." 1 Accreditation Manual for Hospitals (1995), J.C.A.H., M.S. 3.3.3., at 79.

1994), 33 F.3d 1318, 1332, certiorari denied (1995), 514 U.S. 1019, 115 S.Ct. 1363, 131 L.Ed.2d 220.

 Under both federal and state law, the action of those implementing a summary suspension should be reviewed for reasonableness under the circumstances. The reasons for a summary suspension can ultimately be wrong; that is not the test of whether there has been a due process violation. *Austin, supra,* 979 F.2d at 734–735. Accordingly, we reject Dr. Gureasko's apparent equation of the proof necessary for a medical malpractice claim with the information that is sufficient for a summary suspension which comports with due process.[8] The overriding interest to be protected here is patient care and safety. A professional review committee or board of trustees can summarily suspend staff privileges even though the behavior criticized does not deviate from the professional standard of care. In order to avoid liability for damages based upon a due process violation, the action must have been taken with the *reasonable belief* that the failure to take such action might result in an imminent danger to the health of a patient, and the suspension must be followed by adequate notice and hearing procedures. Section 11112(c)(2), Title 42, U.S.Code.

## APPLICATION OF THE LAW TO DR. GUREASKO'S CLAIMS AGAINST BETHESDA

 During the first quarter of 1993, Richard K. Bath, M.D., then president of the Medical Staff of Bethesda, received two reports from the Hospital's Patient Care Representatives which raised concerns about how Dr. Gureasko was practicing at Bethesda.[9] Around March 19, 1993, Dr. Bath forwarded the memoranda to Dr. Lockwood, the Director of the Department of Psychiatry of Bethesda, to

---

8. For this reason, we hold that the trial court correctly refused to receive the portions of Drs. Weaver's and Grancher's affidavits offered to show that Dr. Gureasko's care and treatment of patients did not deviate from professional standards of care.

9. In an affidavit filed with the court, Dr. Bath stated that based upon the information he had received, Dr. Gureasko appeared to be involved in a pattern of conduct risking patient lives. He referred to particular cases:

"In the case of Patient 4, Dr. Gureasko apparently discharged the patient at a time when the patient was still expressing suicidal thoughts and Dr. Gureasko essentially challenged the patient to commit suicide. In the case of Patient 6, Dr. Gureasko radically changed the patient's medication the very first time Dr. Gureasko saw the patient. Dr. Gureasko made no apparent effort to understand the basis on which Patient 6's medications had been prescribed. Not long after this consultation with Dr. Gureasko, Patient 6 reported a suicide attempt. In the other case of Patient 1, Dr. Gureasko had allowed a patient of his to go into a condition seriously risking cardiac arrest because of his failure to ensure that physical examinations and laboratory tests were timely done."

review as part of her duties as Director.[10] Several days later, Dr. Lockwood and Dr. Bath discussed the issues concerning Dr. Gureasko's professional conduct. After this meeting, Dr. Bath decided it was appropriate to have an *ad hoc* committee, whose members had personal knowledge of Dr. Gureasko's conduct, discuss the matter.[11]

Dr. Bath met with the *ad hoc* committee on May 24, 1993, and discussed the memoranda, patient reports, and information concerning thirteen cases handled by Dr. Gureasko. The *ad hoc* committee discussed the suspension of Dr. Gureasko's clinical privileges, but no adverse action was taken at that time. Instead, the committee decided that the information concerning Dr. Gureasko should be reviewed by the Medical Staff Patient Care Committee [12] at its meeting on the following day.

The Medical Staff Patient Care Committee met on May 25, 1993, and recommended that Dr. Gureasko's privileges be suspended. The Executive Committee considered the information pertaining to Dr. Gureasko at a meeting on June 1, 1993.[13] The committee voted unanimously to recommend that the Board of Trustees permanently revoke Dr. Gureasko's clinical privileges at Bethesda and that Dr. Gureasko's clinical privileges be suspended pending final action by the Board of Trustees.

---

10. Dr. Lockwood's appointment as the Director of the Department of Psychiatry became effective on January 1, 1993. Under the Bethesda Medical Staff bylaws, the department director's duties include the duty to "review the professional performance of all individuals with clinical privileges in the department and report and recommend thereon to the Credentials Committee as part of the reappointment process and at such other times as may be indicated," and to "report and recommend to hospital management when necessary with respect to matters affecting patient care in the department, including personnel * * *."

11. The committee is composed of the Chief Executive Officer of Bethesda Hospital, the Co–Directors of the Department of Psychiatry, the Director of Quality Assessment, the Vice–President in Charge of Behavioral Health Services, the Manager of the Department of Psychiatry, and a patient representative.

12. Under the bylaws, the Patient Care Committee includes the directors of all clinical departments in the hospital and is charged with the duty to "oversee the Quality Assurance process relative to clinical practice and the patient care in all Medical Staff departments" and to "report (with or without recommendation) to the Executive Committee for its consideration and appropriate action any situation involving questions of professional ethics, infraction of hospital or medical staff bylaws or rules or unacceptable conduct on the part of any individual appointed to the medical staff."

13. Professional review activities are undertaken by different committees depending upon the general nature of the complaint.
 Members of the Executive Committee include the Medical Staff officers, the directors of each of the hospital's clinical departments, the chair of the Patient Care Committee, and two members elected at large from among the Medical Staff members holding active and teaching privileges.

On June 1 or 2, 1993, Dr. Gureasko received five letters from quality assurance signed by Dr. Lockwood, alleging problems with his treatment and care of patients.

On June 2, 1993, Dr. Gureasko was notified of the summary suspension and of the Executive Committee's recommendation that his privileges be permanently revoked by a letter personally delivered to Dr. Gureasko by Dr. Bath. The letter identified thirteen patients whose treatment served as the basis for the suspension and notified Dr. Gureasko of his right to have a hearing on the Executive Committee's recommendation if requested in writing within thirty days.

The record clearly supports the hospital's obligation under HCQIA that its actions were taken in the reasonable belief that they were in furtherance of quality health care and after a reasonable effort to obtain the facts of the matter. The suspension was followed by adequate procedures, including notice and a comprehensive hearing. Further, the committees which received this information from the original *ad hoc* committee through the fairness hearing were evaluating a fellow physician's qualifications in light of concerns over patient safety.[14] Therefore, the hospital is immune from liability for any damages resulting from the suspension.

We thus hold that the hospital's summary suspension procedure provided sufficient due process to qualify the hospital for immunity under HCQIA as well as under state law. We further hold after a review of the entire record that Dr. Gureasko has failed to rebut the statutory presumption of immunity.[15] The trial court was correct in granting summary judgment to the hospital.

However, while we do not agree with Dr. Gureasko that the fact of his summary suspension should be expunged from his record, we do agree that such a notation, without more, is unfair to him. This entire process is a continuum. At the beginning, when a summary suspension is invoked, the concern over patient safety and welfare is absolutely paramount. At the end of the process, when the fairness hearing has been completed, ending with a recommendation to

---

**14.** R.C. 2305.25 provides:

"No hospital * * * shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the committee:

"(A) A utilization review committee, quality assurance committee, or tissue committee of a hospital * * *;

"(B) A board or committee of a hospital * * * reviewing professional qualifications or activities of the hospital medical staff or applicants for admission to the medical staff[.]"

**15.** The portions of Drs. Weaver's and Grancher's affidavits submitted by Dr. Gureasko which state legal conclusions concerning HCQIA, Dr. Gureasko's due process rights, and Dr. Lockwood's and Dr. Edelstein's actions were correctly stricken by the trial court as testimony beyond the expertise of the witnesses. Evid.R. 702(B).

the Hospital Board of Trustees, the doctor's interest is paramount, and due process *at this point* requires that his record contain the complete story. Accordingly, we direct the hospital to annotate his record to show the ultimate disposition of the fairness hearing along with the fact of his summary suspension.

## IMMUNITY OF DRS. LOCKWOOD AND EDELSTEIN AND STATE LAW TORT CLAIMS

R.C. 2305.25 provides immunity to members of professional review committees for actions taken within the scope of the committees' function. The statute also extends limited protection to those who provide information to review boards and committees. The statute provides that "[n]o person who provides information under this section and provides such information without malice and in the reasonable belief that such information is warranted by the facts known to him shall be subject to suit for civil damages as a result thereof."

In *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, the Ohio Supreme Court held that this statute establishes a qualified privilege. The court further stated:

"Public policy concerns dictate that those who provide information to licensing boards pursuant to R.C. 2305.25 be given a qualified privilege in order to aid in the dissemination of information to those boards, thereby improving the quality of health care administered to the general public." *Id.* at 114, 573 N.E.2d at 612.

In order to defeat this privilege, Dr. Gureasko had to produce clear and convincing evidence that Drs. Lockwood and Edelstein acted with actual malice. "In a qualified privilege case, 'actual malice' is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Id.* at 116, 573 N.E.2d at 614.

Dr. Gureasko has presented no evidence that Dr. Edelstein made any false derogatory statements about him. In his affidavit, Dr. Edelstein stated that he had no involvement in the events leading to Dr. Gureasko's suspension other than being in attendance at the May 24, 1993 meeting. He stated further that he did not say anything derogatory about Dr. Gureasko at the meeting and that he did not recommend Dr. Gureasko's suspension. His only other involvement in the professional review process was to submit a requested affidavit into evidence at the fairness hearing. The contents of this affidavit are privileged pursuant to R.C. 2305.251,[16] and because the information was not offered from another

---

16. Under R.C. 2305.251, proceedings and records of all review committees described in R.C. 2305.25 are confidential and not subject to discovery or admissible in evidence in a civil action against a hospital or a health care professional.

original source, it cannot be considered. Because Dr. Gureasko failed to produce evidence creating a material issue of fact that Dr. Edelstein made malicious statements against him, and Dr. Edelstein produced evidence to the contrary, the trial court was correct in granting summary judgment to Dr. Edelstein on all of Dr. Gureasko's claims against him stemming from his role in the professional review proceedings. Civ.R. 56; *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267.

Dr. Gureasko presented no evidence creating a material issue of fact that Dr. Lockwood made malicious statements about him or that any statements were made without a reasonable belief that the information was warranted by the facts known to her. Dr. Lockwood presented an affidavit denying any malice and explaining the basis for her statements. Dr. Gureasko in his deposition admitted that he felt that Dr. Lockwood believed that her statements were true. The trial court was correct in granting summary judgment to Dr. Lockwood on all of Dr. Gureasko's claims against her stemming from her role in the professional review proceedings. Civ.R. 56; *Dresher* and *Temple, supra.*

Accordingly, the assignment of error is overruled, and the trial court's entry of summary judgment for all defendants is affirmed as modified.

*Judgment affirmed*
*as modified.*

PAINTER and SHANNON, JJ., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.