JOURNAL ENTRY AND OPINION
¶ 1 This is an appeal and cross-appeal from a verdict entered after a jury trial before Visiting Judge James J. Sweeney that awarded damages to appellee/cross-appellant Dr. Azzam Ahmed on his claims against appellant/cross-appellee University Hospital Geauga Regional Hospital ("UH Geauga" or "Hospital") for breach of contract and tortious interference with business relationships and for equitable relief of reinstatement. Dr. Ahmed defends the judgment but also claims the judge erred in failing to enjoin the Hospital to reinstate his staff privileges and in failing to award pre-judgment interest. The Hospital claims, inter alia, that the judge erred in failing to direct a verdict or grant judgment notwithstanding the verdict in its favor on the basis that it is immune from liability because Dr. Ahmed's privileges were revoked in response to peer review proceedings. We affirm.
¶ 2 Dr. Ahmed, an Obstetrician/Gynecologist in practice since 1979, was granted staff privileges at UH Geauga in 1984. In September 1997 and March 1998, two incidents occurred that raised questions about arrangements he had made with other physicians to provide care for, or "cover," his patients when he was absent from the Hospital. These incidents led to peer review proceedings, and in January 1999 his privileges were revoked.
¶ 3 Dr. Ahmed filed a complaint against University Hospitals HealthCare System, Inc. ("UHHS"), UH Geauga, and University Primary Care Practices, Inc. ("UPCP"), alleging breach of contract, tortious interference, and violation of due process with respect to the revocation of his privileges. The case was assigned to Judge Peggy Foley Jones, who made preliminary rulings on discovery and privilege issues, conducted incamera review of peer review documents, and ordered disclosure of certain documents. When the case was transferred to Judge Sweeney for trial, he determined that the parties could introduce evidence of the peer review proceedings, but no evidence concerning the factual determinations that occurred throughout the process, and each could introduce the results of the process only to the extent it was publicly ascertainable. The Hospital was not allowed to present the facts of the two incidents[1]
and the case proceeded upon the stipulation that the peer review proceedings were initiated by two incidents concerning patient "coverage." The jury was specifically informed as follows:
 ¶ 4 This case involves claims by Dr. Ahmed that his privileges to practice medicine at * * * Geauga Regional Hospital were not in accordance with the Geauga Regional Hospital's medical staff's bylaws and did not give Dr. Ahmed due process.
 ¶ 5 Defendants maintain that the process afforded Dr. Ahmed was in accordance with the medical staff bylaws, and that Dr. Ahmed did receive due process.
 ¶ 6 The process that resulted in the revocation of Dr. Ahmed's privileges began with two cases, one in September, 1997 and one in March, 1998. Both cases involved * * * obstetrical services * * * rendered by Dr. Ahmed at Geauga Regional Hospital. Neither involved gynecological services. * * * Both cases involved whether Dr. Ahmed made adequate arrangements to have another physician provide coverage for those patients in his absence while those patients were at Geauga Regional Hospital. * * *
 ¶ 7 Ohio law has a statute that permits hospitals to establish a process to review a doctor's conduct. This case involves such a process. Because of Ohio law, I have ruled that you may not hear or speculate about facts discussed in that process.
 ¶ 8 I am instructing you about this at the beginning of the trial because it is important that you decide this case only on the evidence I permit to be introduced here. In other words, even though you may be curious about the facts and circumstances of the review process, you cannot speculate or infer what did or did not happen during the review process.
¶ 9 The jury heard evidence that the Hospital Professional Affairs Committee ("PAC") met after the September 1997 incident, but no action was taken. After the March 1998 incident, the Hospital's OB/GYN division held a "special ad hoc" meeting, reported its findings to the Medical Executive Committee ("MEC") made up of physicians, and on May 13, 1998, the MEC summarily suspended Dr. Ahmed's staff privileges under the procedures in the Hospital's staff bylaws. Dr. Ahmed's gynecological privileges were restored two weeks later after additional investigation and a meeting where he was permitted to address the committee. His obstetrical privileges were restored at the next MEC meeting on June 10, 1998.
¶ 10 The matter did not end there, however, because the Hospital's Board of Trustees ("Board") initiated "parallel" proceedings to investigate Dr. Ahmed's conduct under other provisions of the bylaws. The Hospital's president notified him that the Board considered the MEC's action to be only a recommendation, and it would take up the matter at its July 16th meeting. At that meeting it voted to revoke his privileges, and this conflict with the MEC's resolution was sent to a Joint Conference Committee ("JCC"), a panel made up of five members each from the Board and the MEC.
¶ 11 Two days later the JCC met, voted to revoke Dr. Ahmed's privileges, and sent its recommendation to the Board's Executive Committee. That committee approved the recommendation and resubmitted it to the Board which affirmed the decision. Dr. Ahmed requested a hearing, under the by-laws, to appeal that decision and, after a two-day hearing, the hearing officer made a recommendation to the Board. In December 1998, Dr. Ahmed was notified that the Board affirmed its decision to revoke his privileges and he had a final right to administratively appeal the revocation to the Appellate Review Body ("ARB"), composed of three Board members and two members of the UH Geauga medical staff.
¶ 12 Dr. Ahmed testified that, when he presented his appeal, the ARB chairman told him that "whatever you say, you have no chance." That same day the ARB recommended that the Board affirm its decision to revoke and, at its meeting held immediately after the ARB hearing, the Board did so. Dr. Ahmed was notified of the final revocation of his staff privileges on January 28, 1999.
¶ 13 At trial Dr. Ahmed presented evidence and argument that, after the MEC restored his privileges, the Board's "parallel" proceedings were not allowed under the Hospital's bylaws because it had no authority to conduct further investigation or review. He also presented evidence that the proceedings were unusual or deficient in a number of other respects, including: (1) that while the JCC was allowed thirty days to conduct further investigation or make a full decision of all its members, and with two of the three physicians from the MEC contingent absent, it issued its decision two days after that of the Board; (2) the JCC failed to submit a written report of its recommendation, although the Hospital argued that the transcribed minutes of that meeting constituted the written report; and (3) in violation of Section 10.1.2 of the bylaws, there was no written request for a preliminary inquiry, necessary before an investigation and other proceedings can take place.
¶ 14 In addition, Dr. Ahmed presented evidence that the revocation of his privileges coincided with UH Geauga granting privileges to three OB/GYN physicians associated with UPCP, a group affiliated with UHHS, who moved their practice to a location near Dr. Ahmed's Geauga County office shortly thereafter. He contended that UHHS preferred the UPCP physicians to independent practitioners because they would refer patients to other doctors and facilities within the UHHS system, and because the patient-doctor relationship would be more profitable to UHHS if the referrals were to UPCP employee/affiliates.
¶ 15 Dr. Ahmed's accountant, Eugene E. Welsh, calculated that his client had lost approximately $60,000 in income from his UH Geauga practice in the year following the revocation. Although the hospital showed that Dr. Ahmed had apparently mitigated his damages by increasing his practice in other locations and continuing to work a full schedule, Welsh opined that he could have increased his practice further by taking on a partner or associate, and that the Geauga practice was still within his capabilities. In calculating damages, Welsh extrapolated the $60,000 loss over a period of only three years. Although there was no dispute that Dr. Ahmed's medical malpractice insurance costs could rise or that he could encounter difficulty in applying for privileges at another hospital a result of the revocation, Welsh did not take that into account.
¶ 16 The Hospital moved for directed verdict at the close of Dr. Ahmed's case, and at the close of all evidence. Both motions were denied on the breach of contract and tortious interference claims, but the judge refused to instruct the jury on Dr. Ahmed's claim for punitive damages. The jury returned a general verdict finding against only UH Geauga liable for breach of contract and tortious interference with business relationships. While the verdicts apparently[2] assessed $200,000 in damages on each count, the parties agreed to a stipulated judgment entry that awarded Dr. Ahmed a total recovery of $200,000. The judge determined the due process, equitable relief count and denied reinstatement, stating that "the procedures that were followed by the Hospital granted Dr. Ahmed his due process rights."
¶ 17 In an unsigned response to a special interrogatory that requested the basis for a decision finding UH Geauga liable for tortious interference, the jury answered that "[w]e feel the hospital did not comply with bylaws under 10.1.2. No written decision from the joint Conference Committee." Although neither party objected to the answer at that time, the judge, sua sponte, instructed the jury to return to the deliberations room to sign the interrogatory answer, which it did, and returned it signed by all eight. UH Geauga moved for judgment notwithstanding the verdict ("JNOV"), and Ahmed moved for prejudgment interest, which were both denied.
¶ 18 UH Geauga asserts the following as a single assignment of error, although it is divided into several sub-issues:
 ¶ 19 I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING UHHS GEAUGA REGIONAL HOSPITAL'S MOTIONS FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.
¶ 20 Before addressing the sub-assignments, we note that two points are relevant to all the issues raised. First, although UH Geauga infused its statement of facts with references to proffered evidence, it has neither assigned error to the exclusion of this evidence, nor argued that the exclusion was erroneous under some other assignment. Its argument is at all times directed only to the evidence admitted at trial, and we will assess none other.[3]
¶ 21 Second, its motions for directed verdict and JNOV challenge the legal sufficiency of the evidence presented, and are subject to the same standard of review. We review the evidence in the light most favorable to Dr. Ahmed to determine whether there was enough evidence to allow a reasonable jury to find in his favor.[4]
¶ 22 UH Geauga's first sub-assignment states:
 ¶ 23 A. THE TRIAL COURT ERRONEOUSLY FAILED TO FIND UHHS GEAUGA REGIONAL HOSPITAL TO BE IMMUNE FROM ANY LIABILITY FOR DAMAGES UNDER THE HEALTH CARE QUALITY IMPROVEMENT ACT OF 1986, [SECTION 11101 ET SEQ., TITLE 42, U.S.CODE] AND [R.C.] 2305.25, BOTH OF WHICH IMMUNIZE HOSPITALS THAT ARE SUED FOR DAMAGES ARISING FROM PHYSICIAN PEER REVIEW ACTIONS.
¶ 24 Under the federal act, a hospital's action revoking privileges is entitled to immunity if it was taken:
 ¶ 25 (1) in the reasonable belief that the action was in the furtherance of quality health care,
 ¶ 26 (2) after a reasonable effort to obtain the facts of the matter,
 ¶ 27 (3) after adequate notice and hearing procedures * * *, and
 ¶ 28 (4) in the reasonable belief that the action was warranted by the facts known * * *.[5]
¶ 29 Under R.C. 2305.25, immunity is more generally granted for "conduct within the scope of the functions of the committee[.]"
¶ 30 The provisions are construed under an objective good faith standard, and the primary issue is whether there was sufficient evidence to allow a jury to determine that the revocation was not objectively "in the furtherance of quality health care" or otherwise within the scope of the committee's authority.[6] The more general provisions of R.C. 2305.25
are reviewed under the same standard, and do not give hospitals broader immunity than the federal act.[7]
¶ 31 Even though UH Geauga points out that the federal act engages a presumption of immunity that Dr. Ahmed was required to rebut by the preponderance of the evidence,[8] we find the evidence sufficient to sustain the jury's finding that he made the required showing. It was presented with evidence that his privileges were revoked after two incidents concerning patient coverage, an issue which Dr. Ahmed testified was a matter of course at UH Geauga. He stated that he had long-standing agreements with other doctors to cover for him in his absence, that the nursing staff was well aware of those arrangements, and that his absence should not have been problematic. The evidence also showed that, while the MEC summarily suspended his privileges, the same committee reinstated them in full within one month. After his reinstatement, UH Geauga's Board continued proceedings against him, a process that, as will be discussedinfra, the jury could determine was against UH Geauga's bylaws. Finally, it heard evidence that the Hospital had a financial motive for continuing the revocation proceedings — namely, that it sought to provide OB/GYN services through the employees of its affiliate, UPCP, rather than through Dr. Ahmed, an independent practitioner.
¶ 32 Our review of this case is restricted by UH Geauga's posture; it has not assigned error to the exclusion of its proffered evidence and, moreover, failed to provide a rational justification for its admission at trial. It proffered evidence concerning the substance of the patient care leading to the revocation of Dr. Ahmed's privileges, and stated an intention to show that the evidence fit within an exception to R.C. 2305.251, which prohibits evidence from peer review proceedings unless "otherwise available from original sources * * *." It failed, however, to make this showing before the judge, the evidence was excluded, and it has not raised the issue here.
¶ 33 UH Geauga argues that the parties' stipulation, which stated that the peer review proceedings were undertaken in response to patient coverage issues, is sufficient to show the reasonable relation to health care concerns necessary for immunity. Dr. Ahmed's testimony and the evidence that the MEC restored his privileges, however, is sufficient evidence from which a jury could conclude that the patient coverage issues were relatively minor, and did not warrant the revocation of privileges.
¶ 34 While we presume that the actions were taken in an objectively reasonable attempt to further quality health care objectives, that presumption is rebuttable, indicating that a hospital cannot avoid all liability by making a bare statement that its actions were grounded on such concerns. The practical end of such a rule would insulate all of its actions, because a committee would be able to find at least one complaint against any physician it found undesirable. The concept of objective reasonableness cannot be ignored in this analysis; the question is whether a jury could find that the revocation of privileges was not reasonably related to the seriousness of Dr. Ahmed's conduct. On the evidence presented, a reasonable jury could so find. The first sub-assignment of error is overruled.
¶ 35 The second sub-assignment states:
 ¶ 36 B. THE TRIAL COURT ERRONEOUSLY FAILED TO GRANT UHHS GEAUGA REGIONAL HOSPITAL'S MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT ON PLAINTIFF'S BREACH OF CONTRACT CLAIM BECAUSE PLAINTIFF PRESENTED NO EVIDENCE AT TRIAL THAT A MATERIAL BREACH HAD OCCURRED.
37. The parties presented the jury with UH Geauga's staff bylaws, as well as evidence and argument concerning whether the revocation proceedings complied with them. Although there was no evidence of factual disputes concerning the meaning of any terms, the parties did not request a legal interpretation from the judge, but instead allowed the jury to determine what the bylaws required before it determined whether UH Geauga complied with them.[9] While ambiguities can be submitted to the jury to determine the actual or reasonable intent of the parties, the judge did not make a finding that the bylaws were ambiguous, nor did the parties request any instructions on the issue.[10] The judge did rule, as a matter of law, that the bylaws constituted a contract, and while UH Geauga stated its disagreement in a footnote to its brief and at oral argument, it has not assigned error to that ruling, has not argued the point, and has cited no authority even in stating its "dispute." In the absence of such argument the error is waived, though we note the judge's ruling appears correct in any event; the staff bylaws indicate that they were submitted and approved by both the medical staff and UH Geauga, satisfying even the strictest rules set forth for such determinations.[11]
¶ 38 The Hospital argues here, as it did to the jury, that the bylaws allowed the "parallel" proceedings, and that it "substantially complied" with the bylaws throughout the proceedings. It contends any failure to fully comply was not material because it would not have yielded a different result. In support of this argument it stresses that the judge found no violation of procedural due process and, therefore, claims any breach of contract must have been immaterial. We disagree.
¶ 39 A physician has only limited procedural due process rights in revocation proceedings.[12] This does not mean, however, that a hospital and medical staff cannot agree to bylaws that go beyond the bare requirements of procedural due process, or that a hospital is only required to comply with such bylaws to the extent due process requires. The parties are bound by the terms of their agreement, and the existence of material breach is considered in relation to those terms. Procedural due process requirements are a floor, not a ceiling, and we have no reason to believe that all hospitals intend their bylaws to provide only the minimum process due, or that the agreement should be so interpreted.
¶ 40 The medical staff bylaws are significant in establishing the atmosphere in which physicians will work, and one way hospitals reasonably could compete for the highest quality personnel, is by providing peer review procedures that employ process beyond that constitutionally required.
¶ 41 Whether a breach of contract is material is a question of fact that requires the assessment of a number of factors, including (a) the extent to which the injured party is deprived of an expected benefit, (b) whether he can be compensated for the deprivation without terminating the contractual relationship, (c) whether terminating the relationship will cause the breaching party to suffer forfeiture, (d) whether the breaching party is willing or able to cure the breach, and (e) whether the breaching party's conduct is consistent with standards of good faith and fair dealing.[13] On the evidence and argument before it, the jury reasonably could find that UH Geauga breached the bylaws, and that the breach was more than "technical." Dr. Ahmed argued that the Board had no authority to reconvene proceedings after the MEC restored his privileges, and the bylaws are susceptible to this interpretation.
¶ 42 Although UH Geauga argued that the MEC's action was a "recommendation" that could be reviewed by the board of trustees, the bylaws suggest that the Board lacks authority to discipline a physician unless the MEC has so recommended. Section 10.2.2 of the bylaws, which governs MEC action in peer review matters, indicates that the MEC has the power to recommend suspension, probation, or other corrective action, but does not indicate that it has the authority to "recommend" that corrective action not be taken. Section 10.3, entitled "SUBSEQUENT ACTION" then states as follows:
¶ 43 10.3.1
 If corrective action, as set forth in Section 10.2.2.4 through 10.2.2.8, is recommended by the Medical Executive Committee, that recommendation shall be transmitted in writing to the member. The member shall then be entitled to a formal hearing as set forth in Section 11.
* * *
¶ 44 10.3.3
 The Medical Executive Committee shall forward its recommendation to the Board of Trustees.
¶ 45 Under Section 10.3.4, the board of trustees is then to act upon the MEC recommendation. There are no provisions requiring or authorizing the MEC to submit a recommendation to the Board unless it believes corrective action is warranted, and Section 10.3 appears to require a recommendation from the MEC before the Board can act. The jury reasonably could interpret these provisions to allow the Board to take corrective action only when the MEC has recommended it. Because the MEC made no such recommendation, the bylaws arguably gave the Board no authority to take action against Dr. Ahmed.
¶ 46 Under this interpretation UH Geauga cannot argue that its revocation proceedings substantially complied with the bylaws or that its breach was immaterial, because it was not entitled to subject Dr. Ahmed to any further proceedings after the MEC restored his privileges. Such a breach is material under the Restatement standard or any other, because the Hospital did not simply skip a meaningless procedural step; it revoked Dr. Ahmed's privileges when it had no authority to subject him to revocation proceedings in the first place.
¶ 47 We do not suggest that the bylaws should be so interpreted as a matter of law, nor are we concerned with discussing the numerous provisions of the bylaws that might be relevant to interpreting the document as a whole, or even to determining whether its terms are ambiguous. Again, because UH Geauga was willing to leave interpretation of the bylaws to the jury, it consented to any reasonable interpretation, and cannot now claim the jury's verdict is merely incorrect.[14] The jury reached a reasonable conclusion, and that is all that was sought. The second sub-assignment is overruled.
¶ 48 The Hospital's third sub-assignment reads:
 ¶ 49 C. THE TRIAL COURT ERRONEOUSLY FAILED TO GRANT UHHS GEAUGA REGIONAL HOSPITAL'S MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT ON PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM BECAUSE PLAINTIFF PRESENTED NO EVIDENCE AT TRIAL THAT ANY INTERFERENCE OCCURRED.
¶ 50 While a breach of contract ordinarily does not give rise to an action for tortious interference with business relationships, such a claim can be sustained where the evidence shows "a motive to interfere with the adverse party's business relations rather than an interference with business resulting as a mere consequence of such breach."[15]
The parties agree that the issue here is whether Dr. Ahmed showed evidence of this exception and, again, we find the evidence sufficient to sustain the jury's verdict.
¶ 51 Construed in the light most favorable to Dr. Ahmed, the evidence showed that the Hospital sought to end its relationship with him in order to open OB/GYN opportunities for UPCP employees affiliated with UH Geauga and the UHHS system. After finding that UH Geauga breached its bylaws in order to conduct revocation proceedings after the MEC restored Dr. Ahmed's privileges, the jury reasonably could have concluded that the breach was more than coincident with the arrival of the UPCP physicians. The jury could find that the Hospital committed the breach with the intention of removing him not only from the hospital, but to effectively deny him the ability to treat patients in the area, thereby allowing the UPCP physicians a greater share of the local OB/GYN patients. This motive is sufficient to sustain the tortious interference claim, because it is more than "merely incidental" to the breach.
¶ 52 Although the Hospital has not argued the point, Dr. Ahmed contends that the judge erred when he refused to submit his punitive damages claim to the jury, an issue raised only in support of affirmance and not for remand. We agree that the judge should have given instructions on punitive damages when there was sufficient evidence to support a tortious interference claim, and where the tort was based on a motive to harm separate from that necessary to breach a contract. The interference shown here is an intentional tort committed with a defined motive,[16] and while its commission does not necessarily reach the "actual malice" necessary to support punitive damages,[17] the evidence is sufficient to reach the jury. Therefore, to the extent necessary to support the tortious interference claim, we find the judge erred in refusing to instruct on punitive damages.
¶ 53 UH Geauga also complains that the jury's answer to the special interrogatory shows that it was entitled to judgment as a matter of law. While it admits that it waived a challenge to the inconsistency between the verdict and interrogatory answer by failing to object before the jury was discharged, it contends that the interrogatory answer is relevant to its sufficiency challenge, citing Greynolds v. Kurman[18]
and Roach v. Norfolk Western Ry. Co.[19] Neither case, however, supports the proposition that a jury's deliberations are relevant to a sufficiency review; instead, Greynolds makes clear that the analyses proceed separately, and that sufficiency review considers the evidence presented to a jury and not the evidence upon which it relied.[20]
Because the interrogatory response is irrelevant to a sufficiency review and the Hospital has foregone any other challenge, we need address the issue no further. The third sub-assignment is overruled.
¶ 54 The fourth sub-assignment states:
 ¶ 55 D. THE TRIAL COURT ERRONEOUSLY FAILED TO GRANT UHHS GEAUGA REGIONAL HOSPITAL'S MOTIONS FOR DIRECTED VERDICT ON PLAINTIFF'S BREACH OF CONTRACT AND TORTIOUS INTERFERENCE CLAIMS BECAUSE PLAINTIFF PRESENTED NO EVIDENCE AT TRIAL THAT HE SUFFERED ANY DAMAGE.
¶ 56 The Hospital submits that Dr. Ahmed failed to prove damages because he was able to mitigate the loss of patients and income at UH Geauga by increasing a newly opened practice in Parma. It took the position that he could not increase his patient load beyond its current level, and, therefore, had fully mitigated any damages from its breach or interference. We disagree. Although Mr. Welsh testified that his client increased his income by expanding his Parma practice, he also opined that Dr. Ahmed could have retained the lost income from his Geauga practice by taking on a partner or associate. Therefore, the evidence was sufficient to allow the jury to award contract damages to Dr. Ahmed because his Parma practice was not dependent upon the breach.
¶ 57 The measure of contract damages is the amount lost as a result of the breach, less any cost avoided as a result of the injured party's mitigation.[21] e damages, however, "are not to be reduced by gains earned by the injured party on transactions unrelated to the breach of contract unless those gains could only have been made as a result of the breach."[22] This doctrine has been narrowly interpreted in favor of injured parties, and the breaching party is strictly held to its duty to show that the gain could only have been made as a result of the breach.[23] Because the jury reasonably could find that Dr. Ahmed could have expanded his practice by taking on a partner or associate, the Hospital's argument fails.
¶ 58 Furthermore, the general verdict and judgment awarded $200,000 in damages, but did not allocate damages to either the contract or tortious interference claims. While damages for tortious interference include the direct economic and consequential damages allowed for breach of contract,[24] tort damages are held to a less stringent standard of certainty.[25] In addition to the evidence of economic loss, there was evidence that Dr. Ahmed's malpractice insurance costs and his future applications for staff privileges at other hospitals would be affected by the UH Geauga revocation. Even if these consequential losses could not be included in contract damages because not properly quantified, the jury could consider them under the less stringent standard of tort recovery. UH Geauga's fourth sub-assignment is overruled, as is its assignment of error generally.
¶ 59 Dr. Ahmed submits the following assignments of error in defense of the jury's verdict:
 ¶ 60 I. THE TRIAL COURT ERRED IN ITS INTERPRETATION OF THE OHIO PEER REVIEW STATUTE, R.C. 2305.24 ET SEQ., WHEN IT PRECLUDED FULL DISCOVERY OF RELEVANT DOCUMENTS AND PRECLUDED DR. AHMED FROM PRESENTING TO THE JURY THE FAVORABLE FINDINGS OF THE PHYSICIAN-COMPRISED MEDICAL EXECUTIVE COMMITTEE AND THE PHYSICIAN-ATTORNEY HEARING OFFICER.
 ¶ 61 II. THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON PUNITIVE DAMAGES.
¶ 62 Dr. Ahmed specifically raises these cross-assignments of error only in defense of the jury's verdict, and does not seek relief beyond affirmance.[26] Because we have affirmed the judgment we find these assignments moot[27] although, as noted supra, we sustain Dr. Ahmed's second assignment of error to the extent that the refusal to submit punitive damages to the jury was inconsistent with a finding that the evidence was sufficient to sustain the tortious interference claim.
¶ 63 In his cross-appeal, Dr. Ahmed asserts two assignments of error, the first stating:
 ¶ 64 I. THE TRIAL COURT ERRONEOUSLY FAILED TO GRANT JUDGMENT TO DR. AHMED ON HIS VIOLATION OF DUE PROCESS CLAIM AND ERRONEOUSLY FAILED TO REINSTATE DR. AHMED'S OBSTETRICS AND GYNECOLOGY MEDICAL STAFF PRIVILEGES.
¶ 65 Dr. Ahmed requests that we reverse the judge's verdict on the due process claim and order the Hospital to reinstate his privileges. As noted para; supra, a party can satisfy the minimum due process protections afforded to physicians in these circumstances yet still breach contractual provisions. Dr. Ahmed's due process claim is bottomed on the argument that the bylaws did not allow the Board to conduct any review after the MEC restored his privileges, and thus any subsequent proceedings were necessarily arbitrary, unreasonable, and a denial of constitutional due process. While we agree that this is a satisfactory contractual argument, asking whether the proceedings were contractually authorized is not the same as asking whether they were constitutionally authorized. Had the contract authorized the proceedings used, they would have been constitutionally acceptable.[28] Dr. Ahmed's citation to Christenson v. Mt. Carmel Health[29] is not to the contrary, because in that case the hospital violated a bylaw provision that also affected constitutional notice requirements.[30]
¶ 66 Even if R.C. 3701.351, which requires hospitals to enact peer review procedures, grants a due process right in enforcement of all the bylaws, we question whether we could grant the requested remedy and force the Hospital to reinstate staff privileges. Dr. Ahmed admitted at oral argument that he can point to no authority supporting such a remedy, and he failed to construct an argument in its favor in his brief but, instead, simply requested the relief. While an argument for reinstatement might be sustainable in a particular case, the equitable relief more likely attainable would concern the record of the proceedings and outcome, such as redaction or supplementation of notices.[31] In any event, Dr. Ahmed has made no persuasive argument for reinstatement here, and we would deny the remedy even if a due process violation could be sustained. The first assignment in the cross-appeal is overruled.
¶ 67 Dr. Ahmed's second assignment in his cross-appeal states:
 ¶ 68 II. THE TRIAL [COURT] ERRED WHEN IT DENIED DR. AHMED'S MOTION FOR PREJUDGMENT INTEREST.
¶ 69. We review the grant or denial of pre-judgment interest for abuse of discretion.[32] Pre-judgment interest is awarded if a plaintiff demonstrates a good faith effort to settle the case, and shows that a defendant failed to make a good faith effort.[33] The Hospital's conduct is evaluated under the following standard:
 ¶ 70 A party has not "failed to make a good faith effort to settle" under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer.[34]
¶ 71 Dr. Ahmed submits that the Hospital failed to rationally evaluate its potential liability and, therefore, unreasonably refused to engage in meaningful settlement negotiations. There was a dispute, however, concerning the efforts each party made to reach a settlement, and the judge had discretion to resolve the conflicting evidence in the Hospital's favor. Moreover, although we are mindful that the determination of an "objectively reasonable belief" should be strictly construed,[35] under the facts and circumstances here the judge was within his discretion to determine that the Hospital had such a belief that it was not liable and had no duty to make a settlement offer. We overrule the second assignment on cross-appeal.
¶ 72 Judgment affirmed.
¶ 73 It is ordered that the appellee/cross-appellant recover from appellant/cross-appellee costs herein taxed.
¶ 74 This court finds there were reasonable grounds for this appeal.
¶ 75 It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
¶ 76 A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, J., CONCURS IN JUDGMENT ONLY; MICHAEL J. CORRIGAN, P.J.,CONCURS AND DISSENTS (See Concurring and Dissenting Opinion).
[1] It profered that evidence.
[2] The verdict forms and interrogatory responses are not part of the record, even though they should be. R.C. 2323.24. Neither party, however, has assigned error to the exclusion, and the contents of these documents can be ascertained from the transcript.
[3] The dissent's reliance on the hearing officer's recommendation is mistaken because that evidence was excluded on UH Geauga's motion, and was not relied on in its motions for directed verdict or JNOV. Although it attached similar evidence to a reply brief in support of its JNOV motion, that evidence also was excluded from trial, again on the Hospital's own motion, and should not be relied upon to support its position. Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co. (1986),28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus; see, also, Doyle Walters Distrib., Inc. v. Marathon PetroleumCo. (Sept. 29, 1992), Richland App. No. 92-CA-2, unreported (party who excludes evidence cannot thereafter claim it should have been admitted).
[4] Srail v. RJF Internatl. Corp. (1998), 126 Ohio App.3d 689, 707,711 N.E.2d 264, 276, citing Posin v. ABC Motor Court Hotel (1976),45 Ohio St.2d 271, 275, 74 O.O.2d 427, 344 N.E.2d 334, 338.
[5] Section 11112(a), Title 42, U.S.Code.
[6] Imperial v. Suburban Hosp. Assn., Inc. (C.A.4, 1994), 37 F.3d 1026,1030.
[7] Gureasko v. Bethesda Hosp. (1996), 116 Ohio App.3d 724, 732,689 N.E.2d 76, 81.
[8] Section 11112(a)(4), Title 42, U.S.Code; Imperial,37 F.3d at 1030.
[9] Cf. Clarke v. Hartley (1982), 7 Ohio App.3d 147, 149, 7 OBR 190, 454 N.E.2d 1322, 1326.
[10] Cf. Id.; Inland Refuse Transfer Co. v. Browning-Ferris Industriesof Ohio, Inc. (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 474 N.E.2d 271,272-273.
[11] See Munoz v. Flower Hosp. (1985), 30 Ohio App.3d 162, 165-166, 30 OBR 303, 507 N.E.2d 360, 364-365.
[12] Gureasko, 116 Ohio App.3d at 729, 689 N.E.2d at 79.
[13] Rhodes v. Rhodes Industries, Inc. (1991), 71 Ohio App.3d 797,807-808, 595 N.E.2d 441, 447-448, citing 2 Restatement of the Law 2d, Contracts (1981) 237, Section 241.
[14] Hal Artz Lincoln-Mercury, Inc., supra.
[15] Digital Analog Design Corp. v. North Supply Co. (1989),44 Ohio St.3d 36, 46-47, 540 N.E.2d 1358, 1368.
[16] Id.; 4 Restatement of the Law 2d, Torts (1979) 20, Section 766B.
[17] Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus.
[18] (1993), 91 Ohio App.3d 389, 632 N.E.2d 946.
[19] (Jan. 21, 1988), Cuyahoga App. No. 52831, unreported.
[20] Greynolds, 91 Ohio App.3d at 395-397, 632 N.E.2d at 950-952.
[21] 2 Restatement of the Law 2d, Contracts (1981) 112, Section 347.
[22] Airborne Express, Inc. v. Sys. Research Laboratories, Inc. (1995), 106 Ohio App.3d 498, 508, 666 N.E.2d 584, 590.
[23] See Id. at 508, 666 N.E.2d at 591 (referring to defendant's evidence as "speculative").
[24] Gray-Jones v. Jones (2000), 137 Ohio App.3d 93, 101-102,738 N.E.2d 64, 70, citing 4 Restatement of the Law 2d, Torts (1979) 54, Section 774A. Dr. Ahmed did not seek damages for reputational harm or emotional distress.
[25] Brookeside Ambulance, Inc. v. Walker Ambulance Serv. (1996),112 Ohio App.3d 150, 158, 678 N.E.2d 248, 254.
[26] R.C. 2505.22; Duracote Corp. v. Goodyear Tire Rubber Co. (1983), 2 Ohio St.3d 160, 163, 2 OBR 704, 443 N.E.2d 184, 187.
[27] App.R. 12(A)(1)(c).
[28] Gureasko, supra.
[29] (1996), 112 Ohio App.3d 161, 678 N.E.2d 255.
[30] Id. at 170-172, 678 N.E.2d at 262-263.
[31] See Gureasko, 116 Ohio App.3d at 735, 689 N.E.2d at 83.
[32] Kalain v. Smith (1986), 25 Ohio St.3d 157, 159, 25 OBR 201,495 N.E.2d 572, 574.
[33] Id.; R.C. 1343.03(C).
[34] Kalain, syllabus.
[35] Moskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638,659, 635 N.E.2d 331, 348.