**BICUDO, Appellant,**

v.

**LEXFORD PROPERTIES, INC. et al., Appellees.**

[Cite as *Bicudo v. Lexford Properties, Inc.*, 157 Ohio App.3d 509, 2004-Ohio-3202.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 03 MA 59.

Decided June 15, 2004.

510

Comstock, Springer & Wilson Co., L.P.A., Marshall D. Buck and Bobbie L. Flynt, for appellant.

Henderson, Covington, Messenger, Newman & Thomas Co., L.P.A., James L. Messenger and Richard J. Thomas, for appellees.

WAITE, Presiding Judge.

{¶ 1} Appellant, Alice S. Bicudo, filed an employment-discrimination complaint in the Mahoning County Court of Common Pleas against Lexford Properties, Inc. ("Lexford"). She also filed suit against her district manager and her immediate supervisor. She alleged discrimination based on sex, national origin, and disability, in violation of both R.C. 4112.02 and tort law. The jury returned interrogatories specifically finding that the defendants did not discriminate against appellant based on sex, national origin, or disability, but returned a contradictory interrogatory finding that appellees wrongfully discharged her on the grounds of discrim-

ination. The jury awarded her $130,000 in damages. Based on the inconsistent answers to the interrogatories and on insufficient evidence of discrimination, the trial court granted appellees a judgment notwithstanding the verdict ("JNOV"). Based on the record, here, the trial court did not abuse its discretion in entering judgment in favor of appellees, and the judgment is affirmed.

### FACTS AND PROCEDURAL SETTING

{¶ 2} Appellant filed her complaint on March 22, 2000, against Lexford, John DeMell (the regional manager), and Brad Phillips (the district manager). There were three causes of action listed in the complaint: (1) discrimination based on sex, national origin, and disability in violation of R.C. 4112.02(A), (2) a tort claim of wrongful discharge in violation of the public policy against discrimination, and (3) intentional infliction of emotional distress. The case went to jury trial on March 3, 2003. At trial, appellant established that she is a woman of Portuguese nationality who came to the United States at age 17. In 1995, she and her husband divorced, and she was awarded custody of their two children. Soon after this, she learned of a job opportunity with Cardinal Realty involving rental property management. Cardinal Realty was later purchased by Lexford Properties, Inc.

{¶ 3} Appellant accepted a job as property manager of the Applegate Complex in Lordstown, Ohio. She was hired by defendant John DeMell, who was also of Portuguese descent. DeMell was a district manager of the company at the time and was appellant's immediate supervisor. DeMell was later promoted to regional manager and was replaced by district manager Brad Phillips, who became appellant's supervisor.

{¶ 4} There is no question that appellant was an at-will employee during her entire employment with Cardinal Realty and Lexford Properties, Inc., and that she had not entered into any written employment contract.

{¶ 5} Other than the fact that both appellant and DeMell were of Portuguese descent (actually, from the Azores, which are Portuguese islands), there is nothing in the record related to appellant's nationality.

{¶ 6} At some point, appellant took over the management of a property known as Springwood. The building was jointly owned by Lexford and by CWB Property Management ("CWB"). Appellant was answerable to both Lexford and CWB in her management of Springwood.

{¶ 7} It was established that appellant was an excellent worker and was ambitious to move up the corporate ladder. Both Phillips and DeMell were happy with her performance. DeMell encouraged her advancement. DeMell also acted paternalistically toward appellant. He asked her about her male

friends and overtly disapproved of some of them, referring to one of them as a "loser." DeMell at one point told appellant that she was living in sin and that she should be embarrassed by her actions.

{¶ 8} Appellant did not complain to anyone about DeMell's attention to her personal life. In fact, appellant testified that she thought of DeMell as family and that she admired him tremendously. Appellant testified that DeMell never made sexual advances toward her, never made a pass at her, and never made sexually inappropriate comments in her presence.

{¶ 9} In November 1998, DeMell suggested that appellant take over a property in Kent, Ohio, and move there. Appellant was honored to be offered the position, except for the fact that the job would have required her to take a $10,000 annual pay cut. DeMell suggested that appellant could meet wealthier men in Kent. DeMell told appellant that, if she did not go to Kent, he would sell the properties she was currently managing.

{¶ 10} In December 1998, Phillips and DeMell both suggested that appellant move to Kent. Appellant told them that they were insulting her intelligence by asking her to take over a larger property while taking a pay cut, and they responded by telling her that she had no intelligence.

{¶ 11} DeMell and Phillips later questioned appellant's loyalty to the company when she missed the company Christmas party to attend a party held by CWB. Furthermore, they were upset with appellant for decisions she made regarding the manner in which her office was set up and her method of sharing expenses with CWB, and they again questioned her loyalty to Lexford.

{¶ 12} In January 1999, Phillips told appellant that the company was going through a difficult financial period. In March 1999, Phillips told appellant she had too many people working at her property and ordered her to fire the cleaning lady and a part-time maintenance person. Appellant fired the two employees, but still retained two other employees. Phillips told appellant that she and the other remaining workers had to clean any vacated apartments. Appellant did not have any cleaning duties prior to this, and appellant was not happy about this decision. At this point, appellant told Phillips that she had asthma. Phillips said he did not care; appellant must find a way to get the cleaning done.

{¶ 13} In March 1999, one of appellant's apartments became vacant and the former tenant left a tremendous mess. Appellant and the two other staff members went to straighten up the apartment, but appellant quickly became ill from allergies and asthma and was taken to Trumbull Memorial Hospital. After appellant left the hospital, she called Phillips and suggested that he fire her so that she could collect unemployment benefits, or that she take an extended sick leave. She suggested that the company could rehire her after she recuperated.

Phillips told appellant to take a vacation. Appellant was asked to turn in her keys. Appellant later was told that the company had accepted her resignation, although she denied ever telling anyone that she was resigning.

{¶ 14} According to Phillips's testimony, appellant told him that she was resigning on the advice of her doctor.

{¶ 15} Other than the results of the one asthma attack, there was no evidence that appellant's asthma affected any other activity in appellant's life.

{¶ 16} Appellant testified that the person who replaced her was a woman.

{¶ 17} At the close of appellant's presentation of evidence at trial, appellees made a Civ.R. 50(A) motion for directed verdict. Appellees argued that there was no evidence of discrimination based on sex, national origin, or disability under R.C. 4112.02, and that the tort of wrongful discharge in violation of public policy must fail because that tort could not be proven without first proving discrimination under R.C. 4112.02. The trial court reserved ruling on the motion until after trial. Appellees renewed the motion at the close of all the evidence. Appellees specifically argued that, without proof of one of the three types of discrimination alleged at trial, appellees were entitled to a directed verdict on the claim of wrongful discharge in violation of public policy.

{¶ 18} Although the trial court did not specifically rule on the motion for directed verdict, it appears that the court essentially granted part of the motion for directed verdict when the court stated: "I have to agree with [appellees' attorney] Mr. Messenger on the public policy thing, because it's in essence the same thing, a discrimination that is unlawful because of public policy rather than a specific statutory or common law." The case was presented to the jury, and just before the jury began deliberations, appellees renewed their Civ.R. 50(A) motion for directed verdict. The court took the motion under advisement. The court also denied appellant's request for a jury instruction on punitive damages.

{¶ 19} The jury returned its verdict on March 6, 2003. The jury returned ten interrogatories with their verdict. In interrogatory one, the jury found that there was no intentional infliction of emotional distress. Interrogatory two did not need to be answered based on the answer to interrogatory one. In interrogatories three, five, and seven, the jury was asked the following questions:

{¶ 20} "Did Plaintiff prove by the greater weight of the evidence that Defendant(s) discriminated against her on the basis of sex?

{¶ 21} "Did Plaintiff prove by the greater weight of the evidence that Defendant(s) discriminated against her on the basis of national origin?

{¶ 22} "Did Plaintiff prove by the greater weight of the evidence that Defendant(s) discriminated against her on the basis of disability?"

{¶ 23} The jury answered "no" to each of these three interrogatories. Based on the negative answers, the jury did not need to answer interrogatories four, six, and eight.

{¶ 24} Interrogatory nine stated:

{¶ 25} "Did Plaintiff prove by the greater weight of the evidence that Defendant(s) discriminated against her on her claim of wrongful discharge?"

{¶ 26} The jury answered yes to this interrogatory. Interrogatory ten listed all three defendants and asked which of the defendants had discriminated against appellant on the claim of wrongful discharge. The jury answered yes with respect to defendants Lexford Properties, Inc. and Brad Phillips, and no with respect to John DeMell.

{¶ 27} The jury also returned a general verdict in favor of appellant with damages of $130,000.

{¶ 28} The trial judge recited the jury interrogatories and verdict. He then asked whether either counsel required anything further from the jury, and they said no. The jury was immediately excused. A few moments later, appellees' counsel renewed his motion for directed verdict and also asked for JNOV on the wrongful discharge claim because the jury had found no discrimination in interrogatories three, five, and seven. Appellant's counsel suggested that the jury should resolve any inconsistencies in their answers to the interrogatories. The trial judge stated that the jury properly answered the questions that they were asked, but that there was a legal issue as to whether the wrongful-discharge claim could stand after the jury had found no discrimination. The court asked the parties to brief the legal question. Appellant's counsel stated that there was a "blatant discrepancy" in the jury answers. The court stated that he would be creating an inconsistency if he recalled the jury, and the trial was adjourned. Up to this point, appellant had not raised the possibility that appellees had waived any challenge to the verdict arising from the inconsistent jury interrogatories.

{¶ 29} On March 12, 2003, appellant filed a brief in opposition to JNOV. Appellant argued that a trial court must enter judgment according to the general verdict if there is any possibility of harmonizing the general verdict with the interrogatories. Appellant argued that the jury interpreted interrogatories three, five, and seven as applying only to discrimination prior to appellant's termination from employment, but that interrogatory nine involved discrimination arising from the wrongful discharge itself. Appellant provided no authority supporting the conclusion that a claim of wrongful discharge in violation of public policy against discrimination could survive once the jury found no discrimination. There is nothing in appellant's memorandum suggesting that appellees waived any challenge to the inconsistent jury interrogatories.

{¶ 30} On March 13, 2003, appellees filed their posttrial brief, in which they argued that the three interrogatories finding no discrimination precluded any finding of wrongful discharge based on discrimination, citing five cases in support. Appellees also pointed out that the trial court had the authority under Civ.R. 49(B) to disregard the jury verdict and render a verdict consistent with the jury interrogatories.

{¶ 31} On March 28, 2003, the trial court filed its judgment. The court found that appellees' Civ.R. 50(B) motion for JNOV was timely. The court found that, as a matter of law, there can be no finding of wrongful discharge in violation of the public policy against discrimination if there is no underlying finding of discrimination. The court cited the same cases referred to in appellees' posttrial brief. The court also ruled on appellees' Civ.R. 50(B) motion based on the general sufficiency of the evidence, and found that there was insufficient evidence to support a finding of discrimination. The court set aside the jury verdict and entered judgment in favor of appellees.

{¶ 32} This timely appeal was filed on April 4, 2003.

## ANALYSIS

{¶ 33} Appellant's first assignments of error asserts:

{¶ 34} "The trial court erred in granting a judgment notwithstanding the verdict."

{¶ 35} Appellant presents four subissues under this assignment of error. First, she argues that the trial court could not consider any evidence when ruling on a JNOV motion—even though a JNOV motion is a direct challenge of the sufficiency of the evidence. Second, she argues that appellees waived any challenge to jury interrogatories, even though appellees raised the same arguments three times during trial and renewed the arguments after the jury was excused. Third, appellant argues that the jury interrogatories and the general verdict can be reconciled, even though this would mean that the jury found both that there was no discrimination based on sex, nationality or disability and, at the same time, that there was discrimination based on sex, nationality, or disability. Fourth, appellant argues that there was sufficient evidence to support the elements of the tort of wrongful discharge. As will be shown below, the record does not support this argument.

{¶ 36} Three of the subissues deal with the trial court's analysis and judgment regarding the contradictory jury interrogatories and verdict. The fourth subissue deals with the trial court's conclusion that there was insufficient evidence of discrimination to support the verdict. Because the trial court based its ruling on

two separate theories, appellant has two hurdles to overcome in order for us to find reversible error in this appeal.

{¶ 37} We begin our review with appellant's second subissue, dealing with the preliminary issue as to whether appellees waived the arguments they raised at trial. Subissue two asks:

{¶ 38} "Whether Appellees are barred from arguing that the general verdict and answers to interrogatories are inconsistent."

{¶ 39} Appellant argues that the trial court could not have examined the inconsistent jury interrogatories because appellees waived the error by not objecting before the jury was dismissed, citing *O'Connell v. Chesapeake & Ohio R.R. Co.* (1991), 58 Ohio St.3d 226, 229–230, 569 N.E.2d 889. It is generally true that obvious inconsistencies in jury interrogatories should be raised prior to the discharge of the jury to avoid having the issue waived as a reversible issue on appeal. *Avondet v. Blankstein* (1997), 118 Ohio App.3d 357, 368, 692 N.E.2d 1063. The policy reasons behind this rule are "(1) to promote the efficiency of trials by permitting the reconciliation of inconsistencies without the need for a new presentation of evidence to a different trier of fact, and (2) to prevent jury shopping by litigants who might wait to object to an inconsistency until after the original jury is discharged." *Greynolds v. Kurman* (1993), 91 Ohio App.3d 389, 395, 632 N.E.2d 946.

{¶ 40} Appellant has the burden of establishing that the trial court committed reversible error by failing to find a waiver of the arguments raised in appellees' Civ.R. 50(B) motion. Whether a party has waived a right is usually a fact-driven analysis, and a trial court's ruling on the issue of waiver will normally not be overturned except for an abuse of the trial court's discretion. *ACRS, Inc. v. Blue Cross & Blue Shield of Minnesota* (1998), 131 Ohio App.3d 450, 456, 722 N.E.2d 1040.

{¶ 41} There are four problems with appellant's argument. First, appellant has herself waived this argument by not raising it at a time when the trial court could have considered it. "Errors which can be corrected or avoided in the trial court are waived when not timely brought to the court's attention." *Stryker Farms Exchange v. Mytczynskyj* (1998), 129 Ohio App.3d 338, 340, 717 N.E.2d 819; *In re Bibb* (1980), 70 Ohio App.2d 117, 118, 24 O.O.3d 159, 435 N.E.2d 96; *Williams v. Jerry L. Kaltenbach Ent., Inc.* (1981), 2 Ohio App.3d 113, 115, 2 OBR 126, 440 N.E.2d 1219. Appellant should have asserted the waiver argument at the time appellees made their Civ.R. 50(B) motion, or in the brief that appellant filed in opposition to the Civ.R. 50(B) motion. Appellant first raised the waiver issue on appeal rather than raising the issue with the trial court, and this normally constitutes a waiver of the issue on appeal.

{¶ 42} Second, appellees did not wait until after the jury was excused to raise the issues that were presented in their Civ.R. 50(B) motion for JNOV. The same arguments were raised in a Civ.R. 50(A) motion at the close of appellant's presentation of evidence and at the end of trial. These arguments were merely renewed after the jury was excused. Appellees' two primary arguments challenged the general sufficiency of the evidence of discrimination and also asserted that, "if the underlying discrimination action is not proven, the public policy discrimination action also fails. It is like a house of cards. You have to prove the first part in order to get to the second part." Appellees reasserted their arguments at the close of its own presentation of evidence and after appellant presented rebuttal evidence. Appellees relied on the same case law during trial and after the jury was excused to support their argument, primarily *Cochran v. Columbia Gas of Ohio, Inc.* (2000), 138 Ohio App.3d 888, 895, 742 N.E.2d 734. There was extensive argument from both parties about these issues throughout the trial.

{¶ 43} If the term "waiver" means, as it usually does in this context, the failure to properly and timely apprise the trial court of an error, then appellees cannot be deemed to have waived their right to challenge the jury verdict on the wrongful discharge claim. Not only did appellees timely inform the trial court of their arguments, but the trial court agreed with them that there could be no wrongful-discharge claim without at least one positive finding in one of the three discrimination claims under R.C. 4112.02.

{¶ 44} Even if appellees can be said to have waived their right to challenge the inconsistent jury interrogatories, they did not waive their right to challenge the overall sufficiency of the evidence. Appellees moved for a directed verdict at the close of appellant's case, at the close of all evidence, and during jury deliberations. Appellees requested a directed verdict because the evidence was insufficient to support a finding of discrimination. After the jury was excused, appellees renewed their motion for directed verdict. The trial court understood that appellees had mistakenly labeled their postverdict motion as a motion for directed verdict, because a motion for directed verdict may be made only "on the opening statement of the opponent, at the close of the opponent's evidence or at the close of all the evidence." Civ.R. 50(A)(1). The trial court interpreted appellees' motion for directed verdict as a motion for JNOV. Based on appellees' prior arguments, the trial court ruled on the JNOV motion based on the sufficiency of the evidence. Therefore, even if appellees waived their right to challenge the inconsistent jury interrogatories, they cannot be said to have waived their arguments regarding the sufficiency of the evidence.

{¶ 45} It must be noted that the trial court had the authority under Civ.R. 49(B) to disregard the general verdict, whether or not appellees challenged the

verdict. Appellees' posttrial memorandum pointed out to the trial court that it had the discretion under Civ.R. 49(B) to disregard the general verdict and enter judgment consistent with the answers to the jury interrogatories. Appellees were raising the idea to the court that it had the power, with or without appellees' pending motions, to render final judgment against the general verdict and consistent with the interrogatories.

{¶ 46} Civ.R. 49(B) states:

{¶ 47} "When the general verdict and the answers are consistent, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. *When one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict,* or the court may return the jury for further consideration of its answers and verdict or may order a new trial." (Emphasis added.)

{¶ 48} Even if appellees had not filed any motions pursuant to Civ.R. 50, the trial court had the independent authority under Civ.R. 49(B) to review the inconsistent answers to the jury interrogatories.

{¶ 49} The Ohio Supreme Court, in *Tasin v. SIFCO Industries, Inc.* (1990), 50 Ohio St.3d 102, 553 N.E.2d 257, paragraph one of the syllabus, held that "[w]here a jury's answers to one or more special interrogatories are irreconcilable with the general verdict, the choice of whether to enter judgment in accord with the answers to interrogatories and against the general verdict, resubmit the case to the jury, or order a new trial lies within the sound discretion of the trial court."

{¶ 50} An abuse of discretion is more than an error of law or judgment but implies an unreasonable, unconscionable, or arbitrary attitude on the part of the trial court. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 51} Whether the trial court actually abused its discretion in setting aside the general verdict is a separate question. There can be no doubt, though, that the trial court had the discretion and duty under Civ.R. 49(B) to review the jury interrogatories to determine whether they were inconsistent with the jury's verdict.

{¶ 52} Based on all of the aforementioned reasons, we find that appellees did not waive their right to challenge the jury's inconsistent answers to the jury interrogatories.

{¶ 53} We now turn to appellant's first subissue, which asks:

{¶ 54} "Whether the trial court erred when it considered the evidence in ruling on defendant's Motion for Judgment Notwithstanding the Verdict."

{¶ 55} The alleged error in this part of appellant's argument is that the trial court ruled on appellee's Civ.R. 50(B) JNOV motion on a basis that was not presented in the motion. According to appellant, the only rationale for JNOV presented in appellees' motion was that the jury's answers to the interrogatories were inconsistent. Appellant contends that this question must be answered by looking only at the general verdict and the answers to the interrogatories and not by looking at the evidence in the case, citing *Mercer Cty. Bd. of Commrs. v. Deitsch* (1916), 94 Ohio St. 1, 113 N.E. 745. Appellant asserts that the trial court erroneously decided to review the evidence in ruling on the motion. The March 28, 2003 judgment entry states that the trial judge examined the evidence, and "[c]onstruing the evidence most strongly in favor of Plaintiff upon the determinative issues of this case, the Court finds that reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to Plaintiff." Appellant concludes that this was reversible error.

{¶ 56} Appellant's argument is not persuasive. We note that *Mercer Cty. Bd. of Commrs.*, cited by appellant, substantially predates the Rules of Civil Procedure and would not directly apply to Civ.R. 50(B). Second, a Civ.R. 50(B) JNOV motion necessarily requires the trial court to look at the evidence. Civ.R. 50(B) states:

{¶ 57} "Whether or not a motion to direct a verdict has been made or overruled and not later than fourteen days after entry of judgment, a party may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion; or if a verdict was not returned such party, within fourteen days after the jury has been discharged, may move for judgment in accordance with his motion. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence. If no verdict was returned the court may direct the entry of judgment or may order a new trial."

{¶ 58} The law governing JNOV motions is quite clear. "The standard for granting a motion for judgment notwithstanding the verdict or in the alternative for a new trial pursuant to Civ.R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ.R. 50(A)." *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 679, 693 N.E.2d 271. That standard is contained in Civ.R. 50(A)(4):

{¶ 59} "When a motion for a directed verdict has been properly made, and the trial court, *after construing the evidence most strongly in favor of the party*

*against whom the motion is directed,* finds that upon any determinative issue reasonable minds could come to but one conclusion *upon the evidence submitted* and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue." (Emphasis added.)

{¶ 60} The Ohio Supreme Court has further refined this standard:

{¶ 61} "In addition to Civ.R. 50(A), it is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion. * * * Thus, 'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied.'" *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284–285, 21 O.O.3d 177, 423 N.E.2d 467, quoting *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115, 4 O.O.3d 243, 363 N.E.2d 367.

{¶ 62} The trial court's JNOV analysis exactly mirrors the well-established standards for reviewing a JNOV motion. The trial court examined the evidence and found it to be insufficient to support the verdict.

{¶ 63} The record also reveals that appellees had made a number of challenges to the sufficiency of the evidence during trial and renewed those challenges in its JNOV motion after trial. The trial court clearly understood the nature of appellees' JNOV motion and ruled accordingly. Based on the well-accepted case law governing JNOV motions, the trial court correctly reviewed the sufficiency of the evidence in its review of the JNOV motion.

{¶ 64} Appellant's third subissue asks:

{¶ 65} "Whether the general verdict and answers to interrogatories can be reconciled."

{¶ 66} Although appellant has based other arguments in this appeal on the fact that the jury interrogatories were patently inconsistent, in this argument she contends that the interrogatories can be reconciled. Appellant contends that a trial court may not set aside a jury verdict pursuant to Civ.R. 49(B) if the jury interrogatories can be reconciled with the general verdict. Civ.R. 49(B) states:

{¶ 67} "When the general verdict and the answers are consistent, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. *When one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict,* or the court may return the jury for further consideration of its answers and verdict or may order a new trial." (Emphasis added.)

{¶ 68} It is generally accepted that a trial court has a duty to reconcile the jury interrogatories and the general verdict if it is reasonably possible, and the standard of review of a trial court's decision in this situation is whether the court abused its discretion. *Tasin*, supra, 50 Ohio St.3d 102, 553 N.E.2d 257, paragraph one of the syllabus. The trial court is not permitted to simply enter the general verdict as its judgment if the interrogatories are inconsistent with the general verdict. *Staff Builders, Inc. v. Armstrong* (1988), 37 Ohio St.3d 298, 306, 525 N.E.2d 783. The trial court is required to enter the appropriate judgment. Id.

{¶ 69} Appellant argues that a Civ.R. 49(B) review is limited to an examination of the interrogatories, the verdict and the pleadings, citing *Cunningham v. Hildebrand* (2001), 142 Ohio App.3d 218, 226, 755 N.E.2d 384. No other court has specifically adopted the test set up by *Cunningham*. It is obvious that appellant does not fully accept it either, because her argument is based on evidence beyond that contained in the interrogatories, the verdict, and the pleadings. She relies heavily on the jury instructions to make her case. *Cunningham* does not mention jury instructions in its list of acceptable documents.

{¶ 70} The Staff Notes to Civ.R. 49(B) state: "[I]f * * * an answer to an interrogatory is inconsistent with the general verdict, the interrogatory prevails." This court has held the same in *Sanders v. Scalise* (Dec. 30, 1993), 7th Dist. No. 91–J–35, 1993 WL 546618.

{¶ 71} The inconsistency in the instant case is between the three findings of no discrimination, on the one hand, and the finding of wrongful discharge based on discrimination, on the other. Appellant concedes that a statutory discrimination claim and a wrongful-discharge claim based on discrimination will stand or fall together in a majority of cases. Nevertheless, she argues that there are situations in which a wrongful-discharge claim could survive even if a plaintiff failed to establish a statutory discrimination case. In order to review appellant's arguments, some background to the two types of claims is in order.

{¶ 72} R.C. 4112.02(A) states:

{¶ 73} "It shall be an unlawful discriminatory practice:

{¶ 74} "(A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 75} Ohio courts examine both federal and state employment discrimination claims under federal case law. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 196, 20 O.O.3d 200,

421 N.E.2d 128. According to both Ohio and federal law, a plaintiff may establish an employer's discriminatory intent by direct evidence, or by indirect evidence using the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. See *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 584, 664 N.E.2d 1272.

{¶ 76} Under *McDonnell Douglas,* a plaintiff bears the initial burden of establishing a prima facie case. In order to do so, the plaintiff must present evidence that (1) she is a member of a protected class, (2) that she suffered an adverse employment action, (3) that she was qualified for the position she lost, and (4) either that she was replaced by someone outside the protected class or that a nonprotected similarly situated person was treated better. *McDonnell Douglas,* supra, 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668. Once a plaintiff has established a prima facie case, the employer assumes the burden of production to articulate some legitimate, nondiscriminatory reason for its action. Id. If the employer carries this burden, then the plaintiff must establish that the reasons the employer offered were not its true reasons but were a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207.

{¶ 77} We now turn to the elements of the tort of wrongful discharge in violation of public policy. The traditional rule in Ohio and elsewhere is that a general or indefinite hiring is terminable at the will of either party, for any cause or for no cause at all. See *Phung v. Waste Mgt., Inc.* (1986), 23 Ohio St.3d 100, 102, 23 OBR 260, 491 N.E.2d 1114; *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150, paragraph one of the syllabus. In the latter half of the twentieth century, an exception to the doctrine of at-will employment developed, which has come to be known as a cause of action for "wrongful discharge," "abusive discharge," "retaliatory discharge," or "discharge in derogation of public policy."

{¶ 78} The origin of the public-policy exception to the employment-at-will doctrine can be traced to the case of *Petermann v. Internatl. Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local 396* (1959), 174 Cal.App.2d 184, 344 P.2d 25. Under this exception, an employer who wrongfully discharges an employee in violation of a clearly expressed public policy will be subject to an action for damages. See, generally, Holloway & Leech, Employment Termination: Rights and Remedies (2d Ed.1993), Chapter 3. In Ohio, this tort is known as "wrongful discharge in violation of public policy." *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, paragraph three of the syllabus.

{¶ 79} The tort initially was conceived in Ohio as remedy for an employee whose discharge violated a statutorily defined public policy. *Greeley* at paragraphs one and two of the syllabus. The issue in *Greeley* was whether an employee could be fired merely because he or she was subject to a child-support order. The employer in *Greeley* did not want to deal with the extra paperwork of withholding child support from the employee's paycheck. Although the child-support statute prohibited the employer from discharging or disciplining an employee because of a child-support order, there was no remedy available in the statute for the wrongfully terminated employee to receive back pay or reinstatement. Id., 49 Ohio St.3d at 230–231, 551 N.E.2d 981. The Supreme Court held that there was a common-law remedy in the form of the tort of wrongful discharge in violation of public policy.

{¶ 80} *Greeley* did not allow the tort to be brought for anything other than the violation of a statute. Id., 49 Ohio St.3d at 234–235, 551 N.E.2d 981. This attitude changed in *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, which held at paragraph two and three of the syllabus:

{¶ 81} "To state a claim of wrongful discharge in violation of public policy, a plaintiff must allege facts demonstrating that the employer's act of discharging him contravened a 'clear public policy.' (*Greeley v. Miami Valley Maintenance Contractors, Inc.* [1990], 49 Ohio St.3d 228, 551 N.E.2d 981, affirmed and followed.)

{¶ 82} " 'Clear public policy' sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law. (*Tulloh v. Goodyear Atomic Corp.* [1992], 62 Ohio St.3d 541, 584 N.E.2d 729, overruled.)" Id. at paragraphs two and three of the syllabus.

{¶ 83} *Painter* suggested defining the tort of wrongful discharge in violation of public policy by using the four elements developed by Villanova Law School professor Henry H. Perritt, Jr.:

{¶ 84} " '1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

{¶ 85} " '2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

{¶ 86} " '3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

{¶ 87} " '4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).' (Emphasis sic.)" Id., 70 Ohio St.3d at 384, 639 N.E.2d 51, fn. 8, quoting H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398–399. See, also, 2 Perritt, Employee Dismissal Law and Practice (4th Ed.1998) 3–4, Section 7.1; see, also, *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 677 N.E.2d 308.

{¶ 88} Less than a year later, the Supreme Court in *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 652 N.E.2d 653, determined that a cause of action may be brought for the tort of wrongful discharge in violation of public policy based on sexual harassment and sexual discrimination in the workplace. *Collins* identified two statutory bases for the public policy against sexual discrimination, one of them being R.C. 4112.02(A). Id. at 72, 652 N.E.2d 653. *Collins* formally adopted the four-part test described in *Painter*. Id. at 69–70, 652 N.E.2d 653. *Collins* noted that the first two elements of the test—the "clarity" and "jeopardy" elements—are questions of law to be determined by the court. Id. at 70, 652 N.E.2d 653. Conversely, the "causation" and "overriding justification" elements are questions of fact for the trier of fact. Id.

{¶ 89} In *Collins,* the Supreme Court also reviewed whether the plaintiff was barred from pursuing a wrongful-discharge tort claim because the tort possibly duplicated the remedies provided by R.C. 4112.02. The Supreme Court allowed the wrongful-discharge tort to be prosecuted because (1) it was based on multiple violations of public policy, and not just on a violation of R.C. 4112.02, and (2) the plaintiff could not avail herself of the remedy provided by R.C. 4112.02 because her employer had only three employees and was exempt from the requirements of the statute under R.C. 4112.01(A)(2). Id., 73 Ohio St.3d at 74, 652 N.E.2d 653.

{¶ 90} In contrast to the *Collins* case, the Ohio Supreme Court determined in *Wiles v. Medina Auto Parts,* 96 Ohio St.3d 240, 2002-Ohio-3994, 773 N.E.2d 526, that there was no separate claim for wrongful discharge in violation of public policy when the tort was based solely on a claimed violation of the federal Family and Medical Leave Act. Id. at ¶ 17. *Wiles* held that the statute provided an adequate remedy, and for that reason, the "jeopardy" element of the wrongful discharge tort could not be satisfied:

{¶ 91} "An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim. [2 Perritt, Employee Dismissal Law and Practice (4th Ed.1998),] 44, Section 7.17. Where, as here, the sole source of the public policy opposing the discharge is a statute that provides the substantive right *and* remedies for its breach, 'the issue of adequacy of remedies' becomes a particularly important component of the jeopardy analysis.

See *Collins,* 73 Ohio St.3d at 73, 652 N.E.2d 653. 'If the statute that establishes the public policy contains its own remedies, it is less likely that tort liability is necessary to prevent dismissals from interfering with realizing the statutory policy.' 2 Perritt at 71, Section 7.26. *Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.*" (Emphasis added.) Id., 96 Ohio St.3d 240, 773 N.E.2d 526, at ¶ 15.

{¶ 92} Some of Ohio's appellate courts have interpreted *Collins* and *Wiles* to mean that a plaintiff cannot assert a claim of wrongful discharge in violation of public policy when the tort claim is based solely on a violation of R.C. 4112.02: *Barlowe v. AAAA Internatl. Driving School, Inc.,* 2d Dist. No. 19794, 2003-Ohio-5748, 2003 WL 22429543 (there is no common-law claim of wrongful discharge based solely on a violation of R.C. 4112.02; the statute provides adequate remedies; "jeopardy" element cannot be satisfied); *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281, 736 N.E.2d 517 (10th District Court of Appeals; the remedies available under R.C. 4112.02 were adequate, precluding additional claim of wrongful discharge in violation of public policy).

{¶ 93} Many appellate districts have also held that a wrongful-discharge claim based on a violation of R.C. 4112.02 must fail if the plaintiff does not establish a violation of R.C. 4112.02: *Vitatoe v. Lawrence Industries, Inc.,* 153 Ohio App.3d 609, 2003-Ohio-4187, 795 N.E.2d 125 (8th District Court of Appeals; without proof of a violation of R.C. 4112.02, there is no proof that public policy has been violated); *Pflanz v. Cincinnati,* 149 Ohio App.3d 743, 2002-Ohio-5492, 778 N.E.2d 1073 (1st District Court of Appeals; wrongful-discharge claim fails because plaintiff was not in class of people protected by R.C. 4112.02; "clarity" element not proven); *Ferraro v. B.F. Goodrich Co.,* 149 Ohio App.3d 301, 2002-Ohio-4398, 777 N.E.2d 282 (9th District Court of Appeals; employee who bases wrongful-termination claim on violation of R.C. 4112.02 must strictly comply with the statute); *Cochran v. Columbia Gas of Ohio, Inc.* (2000), 138 Ohio App.3d 888, 742 N.E.2d 734 (10th District Court of Appeals; plaintiff did not identify any clear public policy other than R.C. 4112.02, and wrongful-discharge claim must fail if R.C. 4112.02 claim fails).

{¶ 94} Although the law on this issue is quite clear, it does not completely resolve the problem that appellant has raised. In the instant case, appellant contends that there were two separate factual claims that were presented to the jury, one involving Phillips's command to fire certain staff members, and the other involving the actual termination of appellant's employment. The trial judge's jury instructions made a clear distinction between what facts would apply to the R.C. 4112.02 discrimination claim versus the facts that would apply to the

common-law wrongful-discharge claim, giving the jury the chance to render two different verdicts on each claim based on different facts.

{¶ 95} Appellant is correct that the trial court instructed the jury that the R.C. 4112.02 claim was based on discrimination arising from the fact that appellees ordered appellant to fire some of her staff and to change the duties of the remaining staff. The trial court twice stated that appellant would have to prove by a preponderance of the evidence that appellees discriminated against her in "changing her work staff and their duties."

{¶ 96} With respect to the wrongful-discharge claim, the trial court focused on whether appellant was discharged from employment, and whether that discharge was caused by discrimination.

{¶ 97} Therefore, appellant is essentially correct that, at least according to the jury instructions (which are not in dispute), the jury was presented with two distinct causes of action.

{¶ 98} The problem with appellant's argument, though, is that both causes of action are defeated by the jury's three findings that there was no discrimination. Obviously, an R.C. 4112.02 claim is defeated by a finding of no discrimination. A wrongful-discharge tort in violation of the public policy against discrimination is also defeated by a finding of no discrimination, because without discrimination there is no public policy that is threatened. Appellant argues that the tort is not defeated by such a finding only because the third element of the tort, causation, requires a finding that the dismissal was *motivated* by discrimination, and does not require a finding of actual discrimination. Appellant fails to consider that the second element of the tort, jeopardy, cannot be satisfied if the jury finds that there was no discrimination. The jeopardy element of the wrongful-discharge tort requires the court to determine whether a public policy is jeopardized because of the employer's actions. The only specific public policy that appellant has relied upon is that contained in R.C. 4112.02, which prohibits discrimination in the workplace. If the jury generally found that there was no discrimination, then there cannot be a scenario where appellees' action could have jeopardized the public policy against discrimination in the workplace.

{¶ 99} The main problem with appellant's argument is that it disregards what the jury interrogatories actually asked the jury to decide. The interrogatories did not ask whether appellees violated R.C. 4112.02. They asked whether appellees discriminated against appellant on the basis of sex, national origin, and disability. This is a much broader question than whether appellees violated a specific statute, and the jury's findings affect both causes of action asserted at trial.

{¶ 100} We agree with the trial court that the jury interrogatories cannot be reconciled with each other or with the general verdict. It is clear that the trial court was required to disregard the general verdict and use one of the options presented in Civ.R. 49(B) to render its judgment. Appellant has not argued that the option chosen by the trial court was an abuse of discretion, but, rather, that the trial court was not permitted to use its discretion at all because Civ.R. 49(B) did not apply. Because Civ.R. 49(B) clearly does apply to the circumstances of this case, we must reject appellant's arguments regarding this subissue.

{¶ 101} Appellant's fourth subissue asks:

{¶ 102} "Whether Alice Bicudo presented evidence sufficient to support her wrongful discharge claim."

{¶ 103} Appellant is arguing that the trial court wrongly decided appellees JNOV motion based on the evidence presented at trial. Although appellant earlier complained that the trial court committed error by examining the evidence when it ruled on appellees' Civ.R. 50(B) motion, appellant now directs this court to a review of the evidence in order to show that she established the elements of the tort of wrongful discharge in violation of public policy.

{¶ 104} An appellate court uses a de novo standard when reviewing a ruling on a Civ.R. 50(B) motion. *Titanium Industries v. S.E.A., Inc.* (1997), 118 Ohio App.3d 39, 47–48, 691 N.E.2d 1087.

{¶ 105} At the risk of restating the obvious, it continues to be clear that in three separate interrogatories the jury states that it found no evidence of discrimination based on sex, national origin, or disability. Without proof of at least one of the three types of discrimination that were litigated at trial, appellant has failed to prove one of the essential elements of the wrongful-discharge claim.

{¶ 106} Looking beyond the jury interrogatories to the actual evidence presented at trial, there is nothing at all in the record supporting appellant's claim of discrimination based on national origin. The only facts relating to national origin were that appellant was from the Azores and that DeMell's ancestors were also from the Azores. There was no attempt to connect these facts to any discriminatory motive.

{¶ 107} It is difficult to understand what appellant's claim of sexual discrimination is based on as well, because there was no evidence of sexual advances, sexual innuendo, or bias against women. There was evidence that appellant encouraged, appreciated, and capitalized on her friendly relationship with DeMell. There was no evidence that she was replaced by a male employee. Appellant does point to evidence that she did not appreciate DeMell's paternalistic opinions about her social life and boyfriends. Even assuming that DeMell

specifically fired appellant because he did not approve of her boyfriends, this type of evidence does not establish sexual discrimination. The Ohio Supreme Court has held that a supervisor's questions about whether an employee had a boyfriend, in and of themselves, are not sexual in nature and cannot be interpreted as sexual harassment. *Cincinnati Bar Assn. v. Young* (2000), 89 Ohio St.3d 306, 319, 731 N.E.2d 631.

{¶ 108} Concerning the alleged discrimination due to disability, appellant did not submit evidence that she was disabled but merely that she had one asthma attack. Under R.C. 4112.01(A)(13), a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." Other than the one incident in March 1999, there was no evidence that appellant's asthma limited her life activities in any way.

{¶ 109} There was also no proof that appellees required appellant to do certain work that she claims she could not perform because of her asthma. Although appellant implies that Phillips ordered her to do housecleaning after he found out about her asthma, the record does not bear this out. According to appellant's own testimony, Phillips said, "I don't care what you do. Just get it done." This was a comment from middle management to lower management concerning one of the responsibilities of management. Phillips did not tell appellant how to carry out her duty as property manager, but rather, told her what one of the duties was. Appellant made the personal choice, as the property manager, to help clean a dirty apartment herself rather than to tell the other hourly staff to do it without her help. Based on this personal choice, appellant suffered an asthma attack. These facts do not show a causal link between appellees' alleged discriminatory intent and the actual harm that appellant suffered, which resulted from her own decisions and actions.

{¶ 110} In summary, our review has not established any persuasive reason for reversing the trial court's rulings with respect to the inconsistent jury interrogatories. Furthermore, the evidence presented at trial was insufficient to support the elements of the tort of wrongful discharge in violation of public policy. Appellant needed to succeed on both of these aspects of the trial court's judgment for us to reverse that judgment. Since appellant has not succeeded in persuading us on either prong, we must overrule appellant's first assignment of error.

{¶ 111} Appellant's second assignment of error asserts:

{¶ 112} "The trial court erred by refusing to instruct the jury on awarding punitive damages."

{¶ 113} Appellant contends that the trial court erred in refusing to instruct the jury on the issue of punitive damages as requested by appellant's proposed jury instructions. This issue is moot given our resolution of appellant's first assignment of error.

{¶ 114} In conclusion, the trial court had the authority and duty under Civ.R. 49(B) to review and rule upon inconsistent jury interrogatories. The trial court correctly found that there was insufficient evidence to support the verdict under Civ.R. 50(B). For both of these reasons, the trial court ruled in favor of appellees. The issue of punitive damages is moot. The judgment of the trial court is affirmed in full.

Judgment affirmed.

GENE DONOFRIO and DEGENARO, JJ., concur.